COMMISSIONER OF TRANSPORTATION *v.*
TOWPATH ASSOCIATES
(SC 16306)

COMMISSIONER OF TRANSPORTATION *v.* JOSEPH
F. WILUSZ ET AL.
(SC 16307)

Borden, Katz, Palmer, Sullivan and Vertefeuille, Js.*

* The listing of justices reflects their seniority status on this court as of the date of argument.

*(Two justices dissenting in one dissenting opinion)*

Argued November 2, 2000—officially released March 27, 2001

*Anthony Jannotta*, assistant attorney general, with whom were *Robert T. Morrin*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellant (plaintiff).

*Robert B. Basine*, for the appellees (defendants).

*Opinion*

KATZ, J. In these consolidated appeals, the plaintiff, the commissioner of the department of transportation (department), challenges the judgments of the judge trial referee (trial court) reassessing condemnation awards to the defendant Towpath Associates (Towpath) and the defendants Joseph F. Wilusz and Carol

C. Wilusz (Wilusz),[1] respectively, in connection with the taking of the defendants' properties by eminent domain. The department contends that the trial court improperly assessed two stone bridge abutments, awarding damages as just compensation based on the value of the property to the state, rather than assessing their value in the ordinary market. We reverse the judgments of the trial court and remand the cases for a new trial.

The following facts reasonably were found by the trial court. The properties at issue lie on opposite sides of the Nepaug River in the town of Canton. The property line runs from west to east down the center of the river. On each bank there exists an abandoned stone bridge abutment and railroad track bed. The Towpath property is located on the south side of the river; the Wilusz property is on the north side. Although the railroad tracks and the bridge, which once had spanned the river connecting the properties, had been removed, the bridge abutments maintained an estimated useful life of 100 years. Neither property contains any other improvements.

The two parcels are located in a designated flood plain district and are zoned to permit single-family dwellings on one-half acre lots. The trial court recognized that, although the size of the condemned parcels precluded any development under the zoning regulations applicable to the flood plain, a special exception existed concerning the construction of bridges thereon.

On April 9, 1998, the department issued separate notices of condemnation and assessments of damages to Towpath and Wilusz under General Statutes § 13a-

---

[1] Carol C. Wilusz was a defendant in the second case in her capacity as executrix of Joseph F. Wilusz' estate. We refer to those defendants jointly as Wilusz. References to the "defendants" are to both Towpath and the Wilusz defendants.

73 (b).[2] Both notices stated that the properties were

[2] General Statutes § 13a-73 (b) provides: "Condemnation of land for state highway or highway maintenance storage area or garage. The commissioner may take any land he finds necessary for the layout, alteration, extension, widening, change of grade or improvement of any state highway or for a highway maintenance storage area or garage and the owner of such land shall be paid by the state for all damages and the state shall receive from such owner the amount or value of all benefits resulting from such taking, layout, alteration, extension, widening, change of grade or other improvement. The use of any site acquired for highway maintenance storage area or garage purposes by condemnation shall conform to any zoning ordinance or development plan in effect for the area in which such site is located, provided the commissioner may be granted any variance or special exception as may be made pursuant to the zoning ordinances and regulations of the town wherein any such site is to be acquired. The assessment of such damages and of such benefits shall be made by the commissioner and filed by him with the clerk of the superior court in the judicial district in which the land affected is located, and such clerk shall give notice of such assessment to each person having an interest of record therein by mailing to each a copy of the same, postage prepaid, and, at any time after such assessment has been made by said commissioner, the physical construction of such layout, alteration, extension, widening, maintenance storage area or garage, change of grade or other improvement may be made. If notice cannot be given to any person entitled thereto because his whereabouts or existence is unknown, notice may be given by publishing a notice at least twice in a newspaper published in the judicial district and having a daily or weekly circulation in the town in which the property affected is situated. Any such published notice shall state that it is a notice to the last owner of record or his surviving spouse, heirs, administrators, assigns, representatives or creditors if he is deceased, and shall contain a brief description of the property taken. Notice shall also be given by mailing to each such person at his last-known address, by registered or certified mail, a copy of such notice. If, after a search of the land and probate records the address of any interested party cannot be found, an affidavit stating such facts and reciting the steps taken to establish the address of any such person shall be filed with the clerk of the superior court and accepted in lieu of service of such notice by mailing the same to the last known address of such person. Upon filing an assessment with the clerk of the superior court, the commissioner shall forthwith sign and file for record with the town clerk of the town wherein such real property is located a certificate setting forth the fact of such taking, a description of the real property so taken and the names and residences of the owners from whom it was taken. Upon the filing of such certificate, title to such real property in fee simple shall vest in the state of Connecticut except that, if it is so specified in such certificate, a lesser estate, interest or right shall vest in the state. The commissioner shall permit the last owner of record of such real property upon which a residence is

"necessary for the layout, alteration, extension, widening, change of grade and improvement of the highway commonly known as . . . Powder Mill Road." The department's taking consisted of 17,160 square feet of land, including the railroad track bed and one of the bridge abutments, on the Towpath side of the river.[3] The Wilusz property contained the other bridge abutment and track bed, and amounted to 27,340 square feet.[4] The department had planned to utilize the bridge abutments, which were in close proximity to the existing roadway, to realign Powder Mill Road. The bridge on that road had been neglected, and the trial court noted that it was "unsafe for vehicular use, and dangerous for pedestrians. It [had] deteriorated to the extent [that] it [was] impassible. Open holes exist[ed] in its pavement . . . ."

situated to remain in such residence, rent free, for a period of one hundred twenty days after the filing of such certificate."

The Wilusz notice also cited General Statutes § 13a-98e, which provides: "The commissioner may acquire by purchase, gift or condemnation in the name of the state such real property or rights of access to and egress from land abutting any federal surface transportation urban program roadway or facility as is necessary to construct and maintain the improvements to any such roadway or facility in the same manner and with like powers as authorized and exercised by said commissioner in acquiring real property or rights of access to and egress from land abutting state highways for highway purposes."

[3] Towpath previously had owned six acres of land, including the 17,160 square feet and bridge abutment, on the south side of the river. In 1995, Towpath had sold that parcel to a third party and then, five months prior to the department's notice of condemnation, that third party deeded the 17,160 square feet at issue herein back to Towpath for "One Dollar ($1.00) and other valuable consideration." Thus, the department condemned the entire Towpath parcel in this case.

[4] Wilusz owned a larger tract on the north side of the river and the department condemned only a portion of that land. The trial court found no residual damage to the Wilusz land remaining after the taking; see *Alemany* v. *Commissioner of Transportation*, 215 Conn. 437, 444, 576 A.2d 503 (1990) (noting that landowner entitled to compensation for value of land taken as well as "severance damages for the diminution in the value of the landowner's remaining property"); and that finding is not at issue in this appeal.

The department assessed damages to the Towpath and Wilusz properties in the amount of $1175 and $1575, respectively, and, in accordance with General Statutes §§ 13a-73 (b) and 48-11,[5] the department deposited those amounts with the clerk of the Superior Court and notified the defendants of the taking. Towpath and Wilusz challenged the assessments by filing further pleadings in the trial court. The cases were referred separately to a judge trial referee. See General Statutes §§ 13a-76,[6]

[5] See footnote 2 of this opinion for the text of § 13a-73 (b). General Statutes § 48-11 provides: "Deposit in court pending determination of amount to be paid. Whenever the state takes property under any provision of the general statutes or any special act, and the state and the owner or owners of such property or of any interest therein are unable to agree on the amount to be paid as just compensation for such property, the taking authority shall file, with the clerk of the court to which a petition for the assessment of just damages has been preferred, a statement of the sum of money estimated by such authority to be just compensation for the property or interest therein taken. Such sum shall be deposited in said court to the use of the person or persons entitled thereto and notice of such deposit shall be given to such person or persons by such clerk. The court may require such person or persons to give bond to the state conditioned on the repayment to the state of so much of such deposit which may be withdrawn as exceeds the amount of compensation finally awarded. Interest shall not be allowed in any judgment on so much of such amount as had been deposited in said court. Upon the application of any such owner or owners, the court, after determining the equity of the applicant in such deposit, may order that the money so deposited, or any part thereof, be paid forthwith for or on account of the just compensation to be awarded in such proceeding. If the compensation finally awarded exceeds the total amount of money so deposited or received by any person or persons entitled thereto, the court shall enter judgment against the state for the amount of the deficiency."

[6] General Statutes § 13a-76 provides in relevant part: "Any person claiming to be aggrieved by the assessment of such special damages or such special benefits by the commissioner may, at any time within six months after the same has been so filed, apply to the superior court for the judicial district within which such land is situated or, if said court is not in session, to any judge thereof for a reassessment of such damages or such benefits so far as the same affect such applicant, and said court or such judge, after causing notice of the pendency of such application to be given to said commissioner, shall appoint a judge trial referee to make such reassessment of such damages or such benefits. Such trial referee, having given at least ten days' notice to the parties interested of the time and place of hearing, shall hear the applicant and said commissioner, shall view the land and take such

48-10[7] and 52-434 (a) (1);[8] Practice Book § 19-3.[9]

The cases were heard separately, but one immediately followed the other. In both cases, the department moved in limine to exclude evidence concerning the value of the bridge abutments. The trial court denied those motions.

In each case, the trial court heard testimony from the defendants' real estate appraiser, Peter R. Marsele,

testimony as such trial referee deems material and shall thereupon reassess such damages and benefits so far as they affect such applicant. . . ."

[7] General Statutes § 48-10 provides that "[t]he determination of the amount of damages in any case brought by the state to condemn land or any interest therein shall be referred to a state referee."

[8] General Statutes § 52-434 (a) (1) provides in relevant part: "Each judge of the Supreme Court, each judge of the Appellate Court, each judge of the Superior Court and each judge of the Court of Common Pleas who ceases or has ceased to hold office because of retirement other than under the provisions of section 51-49 and who is an elector and a resident of this state shall be a state referee for the remainder of his term of office as a judge and shall be eligible for appointment as a state referee during the remainder of his life in the manner prescribed by law for the appointment of a judge of the court of which he is a member. The Superior Court may refer any civil, nonjury case or with the written consent of the parties or their attorneys, any civil jury case pending before the court in which the issues have been closed to a judge trial referee who shall have and exercise the powers of the Superior Court in respect to trial, judgment and appeal in the case. . . ."

Although § 52-434 (a) was amended in 1998; see Public Acts 1998, No. 98-245, § 14; the few minor technical changes did not affect the substance of subsection (a) (1) cited herein. For purposes of clarity, we refer to the current revision of the statute.

[9] Practice Book § 19-3 provides: "The clerk shall give notice to each referee of a reference and note in the court file the date of the issuance of the notice. In addition to matters required to be referred to a judge trial referee, the judicial authority may refer any civil nonjury case or, with the written consent of the parties or their attorneys, any civil jury case, pending before such court, in which the issues have been closed, to a judge trial referee, who shall have and exercise the powers of the superior court in respect to trial, judgment and appeal in such case. Any case referred to a judge trial referee shall be deemed to have been referred for all further proceedings and judgment, including matters pertaining to any appeal therefrom, unless otherwise ordered before or after the reference. The court may also refer to a judge trial referee any motion for summary judgment and any other pretrial matter in any civil nonjury or civil jury case."

and from the department's appraiser, Cynthia L. Bess. In addition, the defendants in both cases provided testimony from a structural engineer, James A. Thompson, concerning the replacement cost of the abutments. Thompson estimated the cost of constructing new bridge abutments on the taken property that would accommodate a bridge like the one proposed by the department.

Marsele compared the value of the Towpath property as a six acre parcel prior to the taking with its postcondemnation value, notwithstanding the fact that Towpath owned only that portion of the property that the department had condemned. See footnote 3 of this opinion. Marsele testified that, in his opinion, the highest and best use of the property was that proposed by the state, to bridge the river, or a similar use connecting the bridge abutments. Although he could not conduct a comparable sales analysis of similar properties with bridge abutments thereon, Marsele compared vacant flood land values and estimated the value of the Towpath property, without the abutment, to be $7200 for the six acre plot. Relying on the report of the structural engineer, Marsele then estimated that the replacement cost of the bridge abutment amounted to $91,300. Thus, in Marsele's opinion, the estimated total property value of the six acres prior to condemnation was $98,500.

Because the Towpath property actually taken by the department was only 17,160 square feet, Marsele estimated the land remaining after the taking to be 5.6061 acres. Applying the same estimates for vacant flood property values to the remaining land resulted in an estimated value of $6700. Marsele obtained his total damage estimate to Towpath as a result of the taking by comparing the before taking estimated value of $98,500 with the estimated value of the land remaining without the abutment of $6700. In essence, Marsele took his estimated value of the six acre property of $98,500 and

from that deducted $6700, the estimated value of the 5.6 acres not taken by the department, resulting in an estimated loss to Towpath of $91,800.

Marsele offered similar estimates in the Wilusz case. He testified that the highest and best use of the property was the same as that of the Towpath property, that is, its use as a bridge site connecting the abutments. Marsele estimated that, prior to the taking, the 2.058 acre parcel of vacant land, without the abutment, had been worth $2500. In addition, he estimated the replacement cost of the abutment to be $91,300, for a total precondemnation value of $93,800. The Wilusz property taken was 27,340 square feet, which, according to Marsele, left an estimated land area of 1.43 acres. Marsele estimated the remaining value of that 1.43 acres to be $1700. Subtracting that from the estimated value of the 2.058 acres and the bridge abutment prior to the taking led Marsele to conclude that Wilusz suffered damages in the amount of $92,100.

Bess, the department's appraiser, testified as well, although in the trial court's view, her analysis regarding the two properties "lacked comprehension" principally because the bridge abutments "were of no consequence in her findings of damage." In Bess' opinion, the zoning restrictions concerning the flood plain property precluded any development and, because the land was vacant, the highest and best use of each of the properties was its "continued present use as vacant/flood zone land."

Bess used a comparable sales analysis to estimate the value of the land and determined that the Towpath property before the taking was 0.51 acres, valued at $1350. After the taking, Bess estimated that 0.12 acres remained and that its approximate value was $360. She concluded that Towpath suffered damages in the amount of approximately $1175.

Similarly, with respect to the Wilusz property, Bess determined that, before the taking, an 8.03 acre plot was worth $20,075. After the taking of 0.63 acres, she estimated the remaining value of 7.4 acres to be $18,500. Thus, Bess estimated that the total damages suffered by Wilusz amounted to $1575.

Following the separate hearings, the trial court issued a joint memorandum of decision. The trial court found that "the highest and best use of the subject properties is their use in the manner proposed by the takings for the relocation and realignment of Powder Mill Road and the replacement of its unsafe and abandoned bridge, or a similar use bridging the Nepaug River, utilizing the existing abutments on its banks, and building a roadway for transportation or recreational purposes over and incorporating the abandoned railroad track bed existing on the properties." The trial court further found that the properties maintained "special adaptability" for such a use. After considering the fact that the abutments constituted "structures that have become a part of the real estate" and that the value of the property must be considered as a whole, "rather than being valued separately in a summation approach," the trial court assessed further damages to Towpath in the amount of $21,125 for a total condemnation award of $22,300. Similarly, the trial court assessed additional damages to Wilusz in the amount of $22,525, for a total condemnation award of $24,100.

Thereafter, the department filed separate appeals in each case in the Appellate Court. Towpath and Wilusz filed cross appeals, and the Appellate Court, sua sponte, consolidated the cases. Both Towpath and Wilusz withdrew their cross appeals and we subsequently transferred the consolidated appeals to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

On appeal, the department maintains that the trial court improperly valued the bridge abutments and

failed to apply the general rule for valuing property enunciated in *Gray Line Bus Co.* v. *Greater Bridgeport Transit District,* 188 Conn. 417, 427, 449 A.2d 1036 (1982) ("[t]he general rule is that the loss to the owner from the taking, and not its value to the condemnor, is the measure of the damages to be awarded in eminent domain proceedings"). The department contends that the trial court gauged the value of the taken property from the condemnor's perspective, and awarded damages to the defendants based on the department's savings in relocating Powder Mill Road and in avoiding the costs of building similar structures to support a bridge spanning the river. The department argues that, in accordance with *Gray Line Bus Co.* v. *Greater Bridgeport Transit District,* supra, 427, in affixing a value to the property, the trial court should have considered the loss to the owners, and the value of the abutments in the ordinary market. The department contends that, from that perspective, the abutments were worthless. The department also maintains that the trial court improperly found that, because of the presence of the abutments, the properties were specially adapted to their use as a bridge site. The department claims that, because the land was held by separate owners and because anyone wanting to build a bridge would have had to connect the parcels, the trial court engaged in improper speculation in awarding compensation for their special adaptability as a bridge site.

Before we consider these arguments, we note that "[t]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings are clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the

facts that appear in the record. . . . *Torres* v. *Waterbury*, 249 Conn. 110, 118–19, 733 A.2d 817 (1999)." (Internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156, 757 A.2d 14 (2000).

Article first, § 11, of the Connecticut constitution provides that "[t]he property of no person shall be taken for public use, without just compensation therefor." This court has stated consistently that "[t]he question of what is just compensation is an equitable one rather than a strictly legal or technical one. The paramount law intends that the condemnee shall be put in as good condition pecuniarily by just compensation as he [or she] would have been in had the property not been taken. *Colaluca* v. *Ives*, [150 Conn. 521, 530, 191 A.2d 340 (1963)]." (Internal quotation marks omitted.) *Alemany* v. *Commissioner of Transportation*, 215 Conn. 437, 444, 576 A.2d 503 (1990).

"The amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. . . . The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course that a market exists for such optimum use." (Citations omitted; internal quotation marks omitted.) *Robinson* v. *Westport*, 222 Conn. 402, 405, 610 A.2d 611 (1992). The highest and best use of a given parcel contemplates "the use which will most likely produce the highest market value, greatest financial return, or the most profit . . . ." (Internal quotation marks omitted.) Id. "In determining its highest and best use the trial referee must consider whether there was a reasonable probability that in the reasonably near future the subject property" would be put to that use, and the effect, if any, that such a prospective use may have on market value at the time of the taking. (Internal quotation marks

omitted.) Id., 406; see also *Greene* v. *Burns*, 221 Conn. 736, 748, 607 A.2d 402 (1992) (questions of highest and best use and reasonable probability of future changes affecting value are factual determinations for trier).[10]

In an eminent domain proceeding, "a trial court may seek aid in the testimony of experts, but must ultimately make its own independent determination of fair compensation . . . on the basis of all the circumstances bearing upon value." (Citation omitted; internal quotation marks omitted.) *French* v. *Clinton*, 215 Conn. 197, 202–203, 575 A.2d 686 (1990). Our cases have "reaffirmed the principle that, because each parcel of real property is in some ways unique, trial courts must be afforded substantial discretion in choosing the most appropriate method of determining the value of a taken property. *D'Addario* v. *Commissioner of Transportation*, 180 Conn. 355, 365, 429 A.2d 890 (1980); *Slavitt*

---

[10] The department argues in this case that "[t]he general rule is that the loss to the owner from the taking, and not its value to the condemnor, is the measure of damages to be awarded in eminent domain proceedings." *Gray Line Bus Co.* v. *Greater Bridgeport Transit District*, supra, 188 Conn. 427. We agree. In some cases, however, the highest and best use of the property may coincide with the use proposed by the condemnor. Likewise, in those cases, the property may be adaptable for the precise use to which both the condemnor will, and, absent the condemnation, a hypothetical willing buyer would have, put the property in the reasonably near future. See *Robinson* v. *Westport*, supra, 222 Conn. 405–406; *Transportation Plaza Associates* v. *Powers*, 203 Conn. 364, 375–76, 525 A.2d 68 (1987). If the adaptability and prospective highest and best use are such that they add to the market value at the time of the taking, they must be considered in assessing the compensation due the property owner. See *Green* v. *Burns*, supra, 221 Conn. 745; *Transportation Plaza Associates* v. *Powers*, supra, 376. Simply because a parcel's highest and best use and adaptability therefor are, in some circumstances, identical to the use proposed by the condemnor does not preclude their consideration as elements bearing on the market value of the property. 4 P. Nichols, Eminent Domain (3d Ed. Rev. 2000, J. Sackman & B. Van Brunt eds.) § 12B.16, pp. 12B-191 through 12B-193. Weighing those elements of value in such a case "is in no way inconsistent with the accepted doctrine that the value of the land taken to the party taking it is not the measure of compensation in eminent domain proceedings." Id., pp. 12B-190 through 12B-191.

v. *Ives*, 163 Conn. 198, 209, 303 A.2d 13 (1972); *Moss* v. *New Haven Redevelopment Agency*, 146 Conn. 421, 425–26, 151 A.2d 693 (1959)." *French* v. *Clinton*, supra, 200–201. "When the land and buildings taken have a market value, that must serve as the measure of damages; if there be no market value, [their] value . . . must be ascertained in some other rational way . . . from such elements as are attainable." (Internal quotation marks omitted.) *Campbell* v. *New Haven*, 101 Conn. 173, 181, 125 A. 650 (1924); see also *Alemany* v. *Commissioner of Transportation*, supra, 215 Conn. 444 (noting that, although market value is ordinarily appropriate measure of fair compensation, "other measures may be appropriate when the fair market value measure of damages does not fully compensate the owner"); *Gebrian* v. *Bristol Redevelopment Agency*, 171 Conn. 565, 576, 370 A.2d 1055 (1976) ("[p]roperty which has no market value may be valued, for condemnation purposes, by some other method"); *Meriden* v. *Highway Commissioner*, 169 Conn. 655, 657, 363 A.2d 1094 (1975) (noting that property that is seldom exchanged lacks ready market value and recourse must be had to other methods of valuation).[11]

Finally, we note that the condemnor is not required to pay the landowner for elements of value that may arise solely by virtue of the condemnation. See *United States* v. *Fuller*, 409 U.S. 488, 492, 93 S. Ct. 801, 35 L. Ed. 2d 16 (1973) (noting that condemnor not required to pay for value that it created); 4 P. Nichols, Eminent Domain (3d Ed. Rev. 2000, J. Sackman & B. Van Brunt eds.) § 12B.17[1], p. 12B-202. Mindful of this general

[11] It is worth clarifying that we do not read the language from these cases as suggesting that there may be a circumstance in which a parcel of property has no ascertainable fair market value. Instead, the reference in these cases to property having "no market value" merely presupposes that some property may not have a fair market value that can be ascertained by employing the comparable sales methodology. These cases state, therefore, that in such a circumstance, another valuation methodology would be appropriate.

framework, we address the arguments in these consolidated appeals.

## I

The dispositive issue in this case is the department's claim that the trial court improperly concluded that the properties maintained special adaptability for their highest and best use as a bridge site. Although it does not directly challenge the trial court's finding with respect to the properties' highest and best use, the department argues that the trial court engaged in speculation when it determined that the two parcels together would be adaptable for the construction of a bridge. Quoting a leading treatise on eminent domain; see 3 P. Nichols, supra, § 8.07, p. 8-109; the department contends that when special adaptability creates a demand for the property by ordinary users in the market, it may be considered as an element of market value, but if that adaptability " 'depends upon the particular parcel being assembled with other parcels so as to make . . . it useful for the intended purpose, then the effect of such contrived or artificially created adaptability is considered too remote and speculative . . . .' "

The defendants point out that the trial court heard testimony from Marsele that it was foreseeable that an entity other than the state would assemble these parcels to erect a bridge thereon. The defendants contend that, because the abutments had been connected in the past and the department had plans to construct a bridge, the trial court properly determined that the properties were specially adaptable for their highest and best use as a bridge site. We agree with the department that, based on the evidence in the record, the trial court's conclusions regarding the special adaptability of the property for its highest and best use were speculative.

## A

In prior cases addressing the value of condemned property based on prospective uses of that property, this court has recognized that "[t]he use to which land can be put with reasonable probability is part of the standard scenario of hypothetical negotiations between a willing buyer and seller." *Transportation Plaza Associates* v. *Powers*, 203 Conn. 364, 376, 525 A.2d 68 (1987); id., 375–76 ("fair market value of realty is determined in light of the use to which it is being put at the time of the taking or to which it *could* be put most advantageously" [emphasis in original]). "Evidence of the special adaptability of land for a particular purpose is properly admitted if there is a reasonable probability that the land could be so used within a reasonable time and with economic feasibility." Id., 375; see also *Connecticut Printers, Inc.* v. *Redevelopment Agency*, 159 Conn. 407, 412, 270 A.2d 549 (1970) ("[i]n order for the value of the plaintiff's premises to be increased by the unusual [adaptability], there must have been a showing not only that the premises were physically or specially adaptable for the particular use upon which the plaintiff solely relied . . . but also that there was a reasonable probability that they would be so used within a reasonable time; otherwise the special use would be too remote and speculative to have any legitimate effect upon the valuation"). A landowner "must provide the trier with sufficient evidence from which it could conclude that it is reasonably probable that the land to be taken would, but for the taking, be devoted to the proposed use by a prudent investor in the near future. . . . The uses to be considered must be so reasonably probable as to have an effect on the present market value of the land. Purely imaginative or speculative value should not be considered. *Tandet* v. *Urban Redevelopment Commission*, 179 Conn. 293, 299–300,

426 A.2d 280 (1979)." (Internal quotation marks omitted.) *Robinson* v. *Westport*, supra, 222 Conn. 409.

The trial court in these cases heard testimony from the defendants' appraiser and engineer that each abutment, independent of the other property, maintained structural integrity such that it could accommodate a bridge project without any other fortification. Thus, there was evidence that it was economically feasible to incorporate a single abutment, regardless of an acquisition of the other abutment, into a potential construction project for the highest and best use of the property.[12] The trial court concluded that "[t]he special adaptability of the land for the purpose of the taking may be considered by the court, as an informed prospective buyer would take such element into consideration in fixing the price he [or she] would be willing to pay for the land." The trial court heard virtually no evidence, however, concerning the prospect that anyone *other* than the department would have acquired one of these properties separately to pursue such a

[12] The dissent appears to conclude that the analysis herein is limited to the separate use of the parcels, rather than their use in tandem. We do analyze the properties at issue in this case separately in part I A of this opinion because titles thereto had been held by separate owners. Moreover, the cases were tried separately, with the trial court specifically admonishing the witnesses to isolate their testimony to the parcel at issue. The cases were consolidated only after the property owners each took separate appeals. In part I B, however, we analyze the trial court's joint memorandum of decision as it is properly read, that is, standing for the proposition that the highest and best use of the properties is a use of the two separately owned parcels *together* as a bridge site.

The dissent posits further that, even if the trial court's finding concerning special adaptability was improper, we should defer to the court's ultimate assessment of value for the parcels. The dissent's approach ignores special adaptability as a factor bearing on the awards when the trial court's finding in this regard is integral, if not identical, to its determination regarding highest and best use. As we more fully articulate in part I B of this opinion, the only real issue in this case concerns the highest and best use of the properties together as a bridge site and whether the property owners are entitled to compensation based on such a use.

project in the reasonably near future. See *United States* v. *Fuller*, supra, 409 U.S. 492; see also *United States ex rel. T.V.A.* v. *Powelson*, 319 U.S. 266, 276, 63 S. Ct. 1047, 87 L. Ed. 1390 (1943) (in estimating probability that lands may be put to use for which they may be adapted, just compensation under fifth amendment to federal constitution requires that "the power of effecting [such a change] by eminent domain must be left out" [internal quotation marks omitted]); *McGovern* v. *New York*, 229 U.S. 363, 372, 33 S. Ct. 876, 57 L. Ed. 1228 (1913) (same); *Greystone Heights Redevelopment Corp.* v. *Nicholas Investment Co.*, 500 S.W.2d 292, 297 (Mo. App. 1973) ("utility or availability of the property for the special purpose of the taker cannot be shown, if the taker is the only party who can use the property for that purpose").

The only testimony regarding the likelihood that someone other than the department would have acquired either one of the properties in the near future to erect a bridge thereon was that of Marsele who simply asserted that, with respect to the highest and best use of the properties, "various agencies" might utilize the abutments. Marsele testified that "[t]his piece could easily be spanned for connecting this abutment to another abutment on the other side of the Nepaug River to create either a bike path and/or a walking path to facilitate recreation. That usually is done by either a town or some of these private organizations that are interested in nature . . . . As a matter of fact, in Canton they're working on a portion of a nature trail right now, not in this area at the moment, but they're working on one." In the absence of evidence to support a finding that there was a reasonable probability that the property would have been used for a bridge site within a reasonable time had the taking not occurred, the trial court's determination that the properties herein were specially adaptable for the highest and best use was nothing more than speculation. *Minicucci* v. *Commissioner of*

*Transportation,* 211 Conn. 382, 385, 559 A.2d 216 (1989) (in determining adaptability for highest and best use as subdivision, trial referee must consider reasonable probability that in reasonably near future subject property will be subdivided); *Transportation Plaza Associates* v. *Powers,* supra, 203 Conn. 377 (trial court had sufficient evidence to establish reasonable probability that land, but for condemnation, would have been put to proposed use by prudent investor in near future; landowner's architectural plans for office building properly considered). We therefore conclude that the trial court's highest and best use finding, that is, that the highest and best use for each separate parcel would be a use incorporating a single abutment into a potential bridge project, is undermined by the speculative nature of the finding regarding the properties' individual adaptability therefor. See *Connecticut Printers, Inc.* v. *Redevelopment Agency,* supra, 159 Conn. 414 ("[a] structure or improvement may add little or nothing to the value unless it is of such a character that it is adapted to some prospective use which affects the market value of the land" [internal quotation marks omitted]).

B

On a more fundamental level, in considering each property separately as specially adaptable for its highest and best use as a bridge site because of the presence of a single abutment, the trial court's conclusion necessarily implies, although an express finding in this regard is lacking in its decision, that it was a reasonable probability that the properties would be connected for such a use in the reasonably near future. Such a finding is implicit in the trial court's conclusion that the properties were specially adaptable for their highest and best use. *Greene* v. *Burns,* supra, 221 Conn. 745 (concluding that trial court implicitly found that zone change affecting fair market value reasonably probable). Although the trial court heard evidence in these cases separately,

the bulk of which was substantially similar, its conclusions assume that it would have been reasonably probable, beyond a mere possibility, that, had the taking not occurred, the owners or a third party would have assembled these parcels to build a bridge. We conclude that the record fails to provide an adequate foundation to support a finding that it was anything other than "imaginative or speculative" that another entity would have acquired these two parcels in the near future to pursue a bridge project. *Robinson* v. *Westport*, supra, 222 Conn. 409.

We heretofore have not addressed the question of whether, in a condemnation proceeding, an award may be made based on a parcel's highest and best use when that use requires an assemblage of separate lands. We recognize, however, "[t]he fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. . . . There must be a reasonable [probability] that the owner could use this tract together with the other [parcels for such] purposes or that another could acquire all lands or easements necessary for that use." *Olson* v. *United States*, 292 U.S. 246, 256–57, 54 S. Ct. 704, 78 L. Ed. 1236 (1934); see also *United States* v. *Fuller*, supra, 409 U.S. 490 ("highest and best use of a parcel may be found to be a use in conjunction with other parcels, and . . . any increment of value resulting from such combination may be taken into consideration in valuing the parcel taken"); *Clarmar Realty Co.* v. *Redevelopment Authority*, 129 Wis. 2d 81, 87, 383 N.W.2d 890 (1986) ("[t]he assemblage approach permits a property owner to introduce evidence in a condemnation proceeding that the

fair market value of its land is enhanced by its probable assemblage with other parcels").[13]

"[I]f a prospective, integrated use is the 'highest and best use' of the land, can be achieved only through combination with other parcels of land, and combination of the parcels is 'reasonably probable,'" then evidence concerning assemblage, and, ultimately, a finding that the land is specially adaptable for that highest and best use, may be appropriate. *Clarmar Realty Co.* v. *Redevelopment Authority*, supra, 129 Wis. 2d 88. The consideration of a future change in the use of the parcel taken and the effect that such a change may have on the market value at the time of the taking has long been recognized in Connecticut, and the use of property in conjunction with other parcels may affect value if it is shown that such an integrated use reasonably would

[13] "The doctrine of assemblage applies when the highest and best use of separate parcels involves their integrated use with lands of another. Pursuant to this doctrine, such prospective use may be properly considered in fixing the value of the property if the joinder of the parcels is reasonably practicable." 4 P. Nichols, supra, § 13.02[9], p. 13-35. We note that courts in some jurisdictions require a unity of ownership of the separate parcels as a prerequisite to applying the doctrine of assemblage; see, e.g., *Oglethorpe Power Corp.* v. *Lewis*, 215 Ga. App. 671, 672, 452 S.E.2d 167, cert. denied, 215 Ga. App. 913 (1994) (purpose of unity of ownership requirement "is to establish that an integrated use of the various parcels is 'reasonably probable.' Without at least substantial unity of ownership and some indication of unity of use, the proposed assemblage is entirely speculative."); while other courts apply the doctrine, regardless of whether the condemnee holds title to other property, as long as an integrated use is within the realm of reasonable probability. See, e.g., *Clarmar Realty Co.* v. *Redevelopment Authority*, supra, 129 Wis. 2d 92–93 (concluding "that the traditional application of assemblage, which does not contain [the] limitation [requiring unity of ownership of all the parcels condemned], better serves the overriding purpose of determining 'just compensation' for owners of condemned land, because it permits property owners to establish a legitimate element of the fair market value of the property, i.e., its value in conjunction with adjacent land to which the owners may or may not hold title"). Because the trial court's decision in this case did not address this issue, we need not decide whether a unity of ownership is an essential predicate to an application of the doctrine of assemblage.

have occurred in the absence of the condemnation. See, e.g., *Budney* v. *Ives*, 156 Conn. 83, 89–90, 239 A.2d 482 (1968) (reasonable probability of zone change may affect value of land at time of taking); *Housing Authority* v. *Lustig*, 139 Conn. 73, 76, 90 A.2d 169 (1952) (proper to consider all elements that owner or prospective purchaser could reasonably urge as fair price of land considering use to which land could be put most advantageously).

A finding that the property is adaptable for its highest and best use is not warranted if the parcels' adaptability depends upon speculative or remote possibilities that the lands may be assembled for that use. *Robinson* v. *Westport*, supra, 222 Conn. 409; see also *United States ex rel. T.V.A.* v. *Powelson*, supra, 319 U.S. 275–76 (recognizing that in order for "special adaptability to be considered, there must be a reasonable probability of the lands in question being combined with other tracts for [the] purpose in the reasonably near future. . . . In the absence of such a showing, the chance of their being united for that special use is regarded as 'too remote and speculative to have any legitimate effect upon the valuation.' "); *McGovern* v. *New York*, supra, 229 U.S. 372 (landowner "entitled to be paid only for what was taken from him as the titles stood, and could not add to the value by the hypothetical possibility of a change unless that possibility was considerable enough to be a practical consideration and actually influence prices").

The trial court in these cases concluded, without any discussion of the reasonable likelihood that the parcels would have been connected had the taking not occurred, that the properties maintained special adaptability for their highest and best use as a bridge site, notwithstanding the fact that title had been held by separate owners prior to the taking. The only plans for utilizing the abutments were those of the department,

and the defendants' appraiser and engineering expert relied on those plans in estimating the value of the properties. Indeed, the trial court quoted from the department's construction plans in its decision. No evidence concerning any other proposed use of this property was presented, aside from Marsele's testimony that the town or "some of these private organizations that are interested in nature" might conceivably decide to build a bridge in the same location. "[A]lthough the possibility of a change . . . always exists in some degree, it [is often] difficult to prove that such a possibility has become a reasonable probability." *Budney* v. *Ives*, supra, 156 Conn. 89–90 ("abundant evidence" presented to support finding of reasonable probability of zone change affecting market value where testimony and town's master plan reflected that such change was imminent). "Because of the uncertainties necessarily attending the determination of the probability of the happening of such an event in the future, claims and evidence regarding the probability must be scrutinized with care and examined with caution." Id., 90.

"Where in the opinion of the appraiser the property is not, on the date of the taking, being put to its highest and best use, it is incumbent upon the appraiser to provide the trier with sufficient evidence from which it could conclude that it is reasonably probable that the land to be taken would, but for the taking, be devoted to the proposed use by a prudent investor in the near future." *Tandet* v. *Urban Redevelopment Commission*, supra, 179 Conn. 299. From the record before us in these cases, we cannot conclude that the trial court properly determined that it was reasonably probable that someone other than the department would have assembled these properties in the near future to construct a bridge thereon. The trial court in this case failed to address the reasonable probability that, but for the taking of the defendants' properties, a prudent investor

would have obtained, in the reasonably near future, both parcels in order to pursue a bridge project. Id.; see also *Arkansas State Highway Commission* v. *Witkowski*, 257 Ark. 659, 663, 519 S.W.2d 743 (1975) (assemblage may be element bearing on market value but, like all elements bearing on value, there must be reasonable basis for damage award); *Tigar* v. *Mystic River Bridge Authority*, 329 Mass. 514, 517, 109 N.E.2d 148 (1952) (uses to which property is reasonably adapted may be considered as bearing on value if "necessity for such use is so imminent as to add something to its present value in the minds of buyers"); *Monmouth* v. *Hilton*, 334 N.J. Super. 582, 590, 760 A.2d 786 (App. Div. 2000) ("a proposed future assemblage of parcels in different ownership cannot be the basis for application of a highest and best use analysis as of the date of taking because as of that date the parcels have not yet been assembled into the integrated unit required to support that use"; case remanded for new trial in absence of evidence of reasonable probability of assemblage affecting market value).

In addition, we note that, although not a conclusive factor, it is undisputed that neither Towpath nor Wilusz had utilized the properties as proposed for their highest and best use; nor did they submit any plans that they, or anyone else, had for using the properties in such a way had the department not condemned the properties for its highway project. See *Transportation Plaza Associates* v. *Powers*, supra, 203 Conn. 375–76. We cannot conclude that the evidence in the record before us is sufficient to support a finding that it was both reasonably probable that someone other than the department would have assembled these properties in the reasonably near future and similarly probable that they would have built, likewise in the foreseeable future, a bridge connecting the properties. Thus, we agree with the department that the trial court's findings with respect

to the special adaptability of the properties for a bridge project, based on the evidence presented, were "remote and speculative" possibilities, rather than reasonable probabilities. *United States ex rel. T.V.A.* v. *Powelson*, supra, 319 U.S. 276; *Robinson* v. *Westport*, supra, 222 Conn. 409; *Minicucci* v. *Commissioner of Transportation*, supra, 211 Conn. 387.

Even if we applied the doctrine of assemblage in accordance with cases from jurisdictions that permit an enhanced value for the taken property when considering its integrated use with other property regardless of unity of ownership thereof, the trial court's decision does not delineate for which aspects of value the increased assessments were awarded. Indeed, because putting the properties to their highest and best use would have required their integration, as of necessity, the trial court's decision assumes that such an integration was reasonably probable, exclusive of the fact that the department had condemned both parcels. See, e.g., *New York* v. *Sage*, 239 U.S. 57, 61, 36 S. Ct. 25, 60 L. Ed. 143 (1915) (under fifth amendment to federal constitution, condemnor "is not to be made to pay for any part of what it has added to the land by thus uniting it with other lots, if that union would not have been practicable or have been attempted except by the intervention of eminent domain"); see also *Kessler* v. *State*, 21 App. Div. 2d 568, 570, 251 N.Y.S.2d 487 (1964) (noting that, absent unity of ownership, "treating separately owned parcels of land as a single tract might result in a windfall of sorts to the party who has interest in one parcel but not in the other").

As we have noted, the trial court necessarily concluded, as a factual matter, that it was reasonably probable that someone other than the condemnor would have obtained, in the foreseeable future, title to these separate properties and then would have constructed a bridge thereon. See *Greene* v. *Burns*, supra, 221 Conn.

748 (question of reasonable probability of zone change question of fact for trier). We conclude that these findings do not find support from the evidence in the record. " '[W]ishful thinking, optimistic conjecture, speculation, rumor and unfounded prognostications do not furnish a proper basis for a finding that a litigant has proved the reasonable probability of a future [event].' " Id., 749, quoting *Budney* v. *Ives*, supra, 156 Conn. 89–90; see also *Greystone Heights Redevelopment Corp.* v. *Nicholas Investment Co.*, supra, 500 S.W.2d 298 (record contained "not one shred of evidence" to indicate that, absent condemnation, any third party bidder ever existed or was likely to appear in reasonably near future; landowners entitled to present such evidence in new trial). Therefore, we conclude that the trial court's finding with respect to the properties' highest and best use, whether separately or, as necessarily found, in tandem, does not find adequate support in this record. Because the evidence in the record before us does not adequately support a reasonable probability that, but for the taking, the properties would have been assembled and devoted to their purported highest and best use as a bridge site, a new trial is required.[14]

II

There has never been anything other than mere speculation in the present cases that, in the absence of assemblage *by the condemnor,* there is or could be a reasonable probability that the defendants' properties

---

[14] We do not need to address the defendant's claim that the trial court improperly relied upon *Orleans & Jefferson Ry. Co., Ltd.* v. *Jefferson & Lake Pontchartrain Ry. Co.*, 51 La. Ann. 1605, 26 So. 278 (1899) (awarding compensation for parcel based on its adaptability for road purposes). We do note, however, that the dispute in that case, although it involved an increased award due to the adaptability of a tract of land containing a discontinued railroad bed that had been condemned for a road project, did not require the assemblage of separately owned parcels. Id., 1620. Thus, *Orleans & Jefferson Ry. Co., Ltd.*, has little relevance with respect to the deficiencies of the evidence in the present cases.

would be devoted to a highest and best use as a bridge site. On the basis of the record before us, the only entity likely to assemble the two properties is the present plaintiff, the department. To compensate the defendants on the basis of that supposition, however, would be to do precisely what condemnation law condemns: valuing the property to the condemnor, not the loss to the condemnee.

Because, however, the trial court has yet to value the properties under appropriate standards, a new trial is necessary. In this connection, we leave open for the new trial court to consider as an initial proposition, and without deciding its propriety, whether the defendants are entitled to some compensation for the abutments under the possible exception to the general rule to which we referred in dictum in *Gray Line Bus Co.* v. *Greater Bridgeport Transit District*, supra, 188 Conn. 427–28 ("[w]e would approve a deviation from [the general rule] . . . in a situation where its application produced an unfair result").

The judgments are reversed and the cases are remanded for a new trial.

In this opinion BORDEN and PALMER, Js., concurred.

VERTEFEUILLE, J., with whom SULLIVAN, J., joins, dissenting. I respectfully dissent. The dispositive issue in this case is not whether the trial court properly concluded that the defendants'[1] condemnation awards should be increased. Rather, the principal question is whether, in increasing the awards based on its consideration of the existing bridge abutments on the properties, the trial court's factual findings were clearly erroneous.

---

[1] The defendant in the first case is Towpath Associates (Towpath) and the defendants in the second case are Joseph F. Wilusz and Carol C. Wilusz, in her capacity as administratrix of Joseph F. Wilusz' estate (Wilusz). References herein to those parties jointly are to the "defendants."

The majority concludes that the trial court's determination that the properties have a special adaptability for a highest and best use as a bridge site was speculative because it was unsupported by the record. The majority therefore concludes that the trial court's increase of the defendants' condemnation award was improper. Because I would find that the trial court did not abuse its discretion by *considering* the special adaptability of the abutments when it assessed the defendants' damages and, most importantly, because the trial court's findings were not clearly erroneous, I must dissent.

The function of the trial court in condemnation hearings is to determine as closely as possible the just compensation for the property taken. *Alemany* v. *Commissioner of Transportation*, 215 Conn. 437, 444, 576 A.2d 503 (1990). This court has held that, in condemnation hearings, the value placed by the trial court on the property taken is a matter of fact and that this court should uphold the trial court's finding unless it was clearly erroneous. *Gebrian* v. *Bristol Redevelopment Agency*, 171 Conn. 565, 571, 370 A.2d 1055 (1976); *Birnbaum* v. *Ives*, 163 Conn. 12, 20–23, 301 A.2d 262 (1972); *Sorenson Transportation Co.* v. *State*, 3 Conn. App. 329, 333, 488 A.2d 458, cert. denied, 196 Conn. 801, 491 A.2d 1105 (1985).

We have afforded trial courts substantial discretion in choosing the most appropriate method of valuing the property taken. *Robinson* v. *Westport*, 222 Conn. 402, 410, 610 A.2d 611 (1992); *French* v. *Clinton*, 215 Conn. 197, 200, 575 A.2d 686 (1990). "The usual measure of just compensation is the fair market value or the price that would probably result from fair negotiations between a willing seller and a willing buyer, taking into account *all* the factors, *including* the highest and best or most advantageous use, *weighing and evaluating* the circumstances, the evidence, the opinions expressed by the witnesses and *considering* the use to

which the premises have been devoted and which may have enhanced its value." (Emphasis added.) *Wronowski* v. *Redevelopment Agency*, 180 Conn. 579, 585, 430 A.2d 1284 (1980); see also *D'Addario* v. *Commissioner of Transportation*, 180 Conn. 355, 365, 429 A.2d 890 (1980); *Tandet* v. *Urban Redevelopment Commission*, 179 Conn. 293, 298, 426 A.2d 280 (1979); *Mazzola* v. *Commissioner of Transportation*, 175 Conn. 576, 581–82, 402 A.2d 786 (1978); *Birnbaum* v. *Ives*, supra, 163 Conn. 18; *Connecticut Printers, Inc.* v. *Redevelopment Agency*, 159 Conn. 407, 410–11, 270 A.2d 549 (1970); *Stanley Works* v. *New Britain Redevelopment Agency*, 155 Conn. 86, 102, 230 A.2d 9 (1967). "The general rule is that the loss to the owner from the taking, and not its value to the condemnor, is the measure of the damages to be awarded in eminent domain proceedings." *Gray Line Bus Co.* v. *Greater Bridgeport Transit District*, 188 Conn. 417, 427, 449 A.2d 1036 (1982). As the majority recognizes in its opinion, however, the question of just compensation is a matter of equity rather than a strictly legal or technical matter. *Alemany* v. *Commissioner of Transportation*, supra, 215 Conn. 444.

A trial court must reach its determination of value and fair compensation for the taken property "in light of all the circumstances, the evidence, its general knowledge and its viewing of the premises." (Internal quotation marks omitted.) *Robinson* v. *Westport*, supra, 222 Conn. 410; see also *French* v. *Clinton*, supra, 215 Conn. 200. In prior decisions, this court has afforded the trial court the discretion to consider its own visual observations of the taken property in its determination of its value. *Birnbaum* v. *Ives*, supra, 163 Conn. 20. This court has concluded that a trial court's visual observations "are as much evidence as the evidence presented [to the trial court] by the witnesses under oath." Id.; see *Gentile* v. *Ives*, 159 Conn. 443, 452, 270

A.2d 680 (1970), cert. denied, 400 U.S. 1008, 91 S. Ct. 566, 27 L. Ed. 2d 621 (1971); *Houston* v. *Highway Commissioner*, 152 Conn. 557, 558, 210 A.2d 176 (1965). This court has also held that the trial court has the discretion to disregard the opinion of an expert or appraiser. *Birnbaum* v. *Ives*, supra, 20–21. We also have concluded consistently that the trial court has the discretion to use other measures to determine value when the fair market value measure of damages does not fully compensate the owner of the taken property. *Alemany* v. *Commissioner of Transportation*, supra, 215 Conn. 444; *Birnbaum* v. *Ives*, supra, 18; *Connecticut Printers, Inc.* v. *Redevelopment Agency*, supra, 159 Conn. 414. With these standards in mind, I will address what I see as various problems with the majority's opinion.

I first take issue with the majority's reading of the factual findings made by the trial court and its analysis based upon that reading. Specifically, the majority concludes that the trial court analyzed the properties separately and not in tandem when it reached its determination of the properties' value. After reaching that conclusion, the majority proceeds to consider the properties as separate parcels for purposes of its legal analysis rather than considering them jointly. The majority then concludes that the trial court's consideration of the abutments' joint usage is speculative. This simply is wrong. The evidence demonstrates conclusively that the trial court considered the properties in tandem.

The trial court's memorandum of decision clearly demonstrates that, although the trial court heard the evidence concerning the two properties separately in two immediately consecutive trials, it considered the properties in tandem when it made its determination

of value.[2] Moreover, the evidence demonstrated that the plaintiff, the commissioner of the department of transportation (department), had condemned the properties on the very same day, virtually simultaneously through two consecutive deposits, for the purpose of using the two adjacent properties *together* in order to construct a new highway bridge connecting one bridge abutment with the other. The department's construction plans, which were reviewed by the trial court, clearly show that the department had planned to use the properties jointly. Additionally, the defendants' real estate appraiser, Peter R. Marsele, testified concerning the possible joint uses of the properties as a bicycle path or hiking trail, never stating that the abutments could be used separately.[3] Moreover, the abutments were historically used together to support a railroad bridge that had spanned the Nepaug River. Despite the clear evidence that the department intended to use the properties jointly, as they had been in the past, the majority persists in considering each property sepa-

---

[2] The trial court stated: "The court finds that the highest and best use of the subject *properties* is *their* use in the manner proposed by the takings for the relocation and realignment of Powder Mill Road and the replacement of its unsafe and abandoned bridge, *or* a similar use bridging the Nepaug River, utilizing the existing abutments on its banks, and building a roadway for transportation or recreational purposes over and incorporating the abandoned railroad trackbed existing on the properties. There is a special adaptability of the subject premises for such highest and best use." (Emphasis added.)

[3] Marsele testified to the following: "[T]he best use to which this property can be put is for use of the existing bridge abutment to relocate Powder Mill Road as proposed for the taking by the state of Connecticut. It also has other use[s], Your Honor, but they would all be of bridge uses in nature. I can't think of anything other than bridge uses by various agencies that could use such a facility. . . . This piece could easily be spanned for connecting this abutment to another abutment on the other side of the Nepaug River to create either a bike path and/or a walking path to facilitate recreation. That usually is done by either a town or some of these private organizations that are interested in nature, what we call the state nature trail."

rately. Unlike the majority, I would uphold the trial court's consideration of the properties in tandem.

Second, the majority's opinion also pointedly ignores the "windfall exception" to the general rule enunciated in *Gray Line Bus Co.* v. *Greater Bridgeport Transit District*, supra, 188 Conn. 429–30, and quoted in the trial court's memorandum of decision. In *Gray Line Bus Co.*, this court stated: "Although benefit to the taker may not be the measure of damages in a condemnation proceeding, *it is not wholly irrelevant* in deciding whether the taking of a particular form of property merits some award. The basic principle that private property may not be taken without just compensation is offended *where a public authority is permitted to receive a windfall of substantial value* without some recognition of the interest of the owners in the form of a reasonable award." (Emphasis added.) Id.

There was testimony from the defendants' structural engineer, James A. Thompson, that supported the trial court's consideration of the windfall exception. Thompson, whose occupation as a civil engineer required him to review cost estimates by contractors, testified that he evaluated the replacement cost of the abutments on the defendants' properties. He determined the replacement costs of the abutments by estimating the cost that the department did not have to expend for the new bridge construction due to the existing abutments. His evaluation included a review of the department's construction plans, which incorporated the existing abutments into the construction of the new bridge. Thompson also considered the structure and adaptability of the abutments to the department's construction plans, as well as the existing life of the abutments. Thompson estimated that the value of each abutment, based on the cost savings to the department, was $91,779 and $91,271 for the abutments on the Towpath and Wilusz properties, respectively.

On the basis of this evidence, the trial court, which has substantial discretion when choosing the most appropriate method in reaching a determination of value for condemned property; see *Robinson* v. *Westport,* supra, 222 Conn. 410; considered the substantial cost savings to the department when it determined the value of the taken properties. The trial court's *consideration* of the department's substantial cost savings is further evidenced by the trial court's awards of $22,300 and $24,100 for the Towpath and Wilusz properties, respectively, instead of awarding damages to the defendants equal to the appraisal figure submitted by Thompson. Because this court previously has held that a benefit to the taker is not wholly irrelevant when the taker receives a windfall of substantial value; see *Gray Line Bus Co.* v. *Greater Bridgeport Transit District,* supra, 188 Conn. 429–30; I would conclude that the substantial windfall the department will receive here by taking the properties with the abutments thereon establishes sufficient grounds for the trial court to increase the amount of compensation the department must pay the defendants for the taken property.

Third, I cannot agree with the majority that we must reverse the trial court's judgment and order a new trial based on the trial court's conclusion that there is a special adaptability of the Towpath and Wilusz properties for the highest and best use to bridge the Nepaug River. Even if we were to assume that there is insufficient evidence to warrant such a finding, the trial court's assessment of the damages to Towpath and Wilusz, totaling $22,300 and $24,100, respectively, was not based solely on this special adaptability finding. The trial court's memorandum of decision did not allocate separate values to the independent components of its assessment. See id., 421. The trial court does detail, however, the evidence relating to the various components that were taken into consideration in arriving at

the total awards. See id. The trial court, under the duty with which it is charged, reached an assessment of damages that encompassed all the circumstances, all of the evidence, and its general knowledge, which *included* the factor of special adaptability. Cf. *Robinson* v. *Westport,* supra, 222 Conn. 410.

In its memorandum of decision, the trial court closely examined the testimony of the parties' appraisal witnesses. After it determined that the department's appraiser, Cynthia L. Bess, had reached an improper conclusion because she failed to consider certain facts the court deemed important in reaching a correct appraisal, the only remaining appraisal testimony was that of the defendants' appraiser, Marsele. The trial court, however, did not merely accept the testimony of Marsele as the definitive word with regard to the properties' value; rather, it found improprieties in his appraisal as well.[4] The trial court also considered the testimony of the structural engineer, Thompson, who, on behalf of the defendants, testified with regard to the replacement cost of the abutments. In addition, the trial court examined the department's construction plans.

After the trial court found that the abutments were structures that had become affixed to the properties and that it had to consider the value of the abutments in determining the defendants' compensation, the trial court also considered other factors. See 4 P. Nichols, Eminent Domain (3d Ed. Rev. 2000, J. Sackman & B. Van Brunt eds.) § 13.01; id., pp. 13-3 through 13-4 ("[t]he public entity must . . . compensate the owner for all that is attached to the underlying soil"). To reach a fair compensation for the taken property, the trial court weighed the reproduction cost of the abutments. It

[4] The trial court, having determined that Marsele incorrectly concluded that the Towpath taking was a partial taking, concluded that the Towpath taking was in fact a total taking.

looked at the zoning restrictions and regulations in the district where the properties were located. Additionally, the trial court considered the properties' fair market value and the benefit of the abutments to the department. It also took into account the special adaptability of the properties for bridging the Nepaug River and concluded that this use was the properties' highest and best use. Furthermore, the trial court personally viewed the properties and their surrounding areas. After considering all of these factors, the trial court reached a determination of the properties' value, which resulted in the defendants' award of compensation.

The trial court reached an independent determination of value and fair compensation. Keeping in mind that: (1) Bess determined that the damage to Towpath and Wilusz was $1175 and $1575, respectively; (2) Marsele determined that the damage to Towpath and Wilusz was $91,800 and $92,100, respectively; and (3) Thompson testified that the department would save over $180,000 by taking these particular properties with the abutments as opposed to constructing new bridge abutments; the trial court reached the conclusion that Towpath's and Wilusz' total damages were $22,300 and $24,100, respectively. There was evidence before the trial court that the properties were especially desirable or adaptable to construct a bridge thereon and that properties of similar adaptability for this purpose were not available in that area. See *Gray Line Bus Co.* v. *Greater Bridgeport Transit District,* supra, 188 Conn. 420. The trial court did not rest its determination exclusively on its finding of the properties' special adaptability, but, rather, based its assessment on numerous factors.[5] As

[5] The trial court specifically stated that its finding of value was based on "all the circumstances, consideration of the evidence, general knowledge of the elements constituting value, and a viewing of the property and surrounding area . . . ."

such, I cannot support today's decision to reverse the trial court's findings merely because the majority believes that one of the factors the trial court considered is not adequately supported.

Finally, the majority does not conclude that there is any fault in the legal standards the trial court used to reach its assessment of the properties. Cf. *Unkelbach* v. *McNary*, 244 Conn. 350, 367, 710 A.2d 717 (1998). Rather, the majority concludes that there is an "absence of evidence" to warrant an increase of the defendants' award. This, however, is not a case in which there is no evidence in the record to support the increase of the defendants' awards. Nevertheless, the majority ignores the factual findings made by the trial court and, effectively, has usurped the function of the trial court by substituting its own findings for those of the trial court. Where the trial court has made findings of fact, which it is afforded substantial deference to do, we are limited to affirming those findings unless they are clearly erroneous. *Robinson* v. *Westport*, supra, 222 Conn. 410; *Gebrian* v. *Bristol Redevelopment Agency*, supra, 171 Conn. 571. Under the circumstances of this case, I see no reason to abandon this standard. I would affirm the trial court's findings and, therefore, I respectfully dissent.[6]

---

[6] In footnote 12 of its opinion, the majority interprets this dissent as concluding that even if the trial court's finding concerning the special adaptability of the properties was improper, we should nevertheless defer to the trial court's ultimate assessment. In light of the analysis set forth herein, it should be apparent that the majority improperly characterizes this dissent.