[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On January 14, 2000, the Commissioner of Transportation asserted the State's right of eminent domain against the defendants' property situated in the town of Watertown and filed a Notice of Condemnation, together with an Assessment of Damages, with the Clerk of the Superior Court for the judicial district of Waterbury.[1] The partial taking of the premises was declared to be necessary for the layout, alteration, extension, widening, change of grade and improvements of the highways known as Middlebury and Bunker Hill Roads, so-called, in the said town of Watertown. The description of the property partially taken is appended hereto and fully incorporated herein as Appendix One (1). The damages CT Page 1041 assessed by the Commissioner for the partial taking were thirty-four thousand two hundred ($34,200) dollars, which sum was deposited with the Court for the use and benefit of the persons entitled thereto. The Smiths allege that the award and assessment were inadequate and filed an appeal asserting that they were aggrieved by the action of the Commissioner in the amount of the assessment. As the owners of the property, they are certainly aggrieved. See Bossert Corporation v. Norwalk, 157 Conn. 279,285 (1968).
The parcel taken is a portion of the forty-seven point thirty-three (47.33) acre piece which was undeveloped when purchased by the defendants in 1993. Prior to that time, the land had been subject to a supposed subdivision submitted to the zoning authorities of the town of Watertown. That subdivision was known as Stablegate, and it included the subject two (2) parcels at the intersection of Bunker Hill Road and Middlebury Road. Immediately to the rear of and abutting the two single-family lot parcels, as represented by the owners, at the intersection of those two roads is a larger area of wetlands dividing those two lots from the remainder of the property which is located east of and uphill from the area in issue and extends to the rear of the property. The two (2) lots in issue were known and designated as lots seventeen (17) and eighteen (18) on the Stablegate subdivision map, and those lots cannot be extended easterly because of the aforementioned wetlands.
However, when the Smiths purchased the property, they had no interest in subdividing it, but desired to own it for family use to divide at some later date as they desired to meet the needs of the family as then required. With that purpose in mind, they never filed the subdivision map, never deeded any portion of the property as a subdivision, and abandoned the pursuit of such subdivision on that property.
The defendants were aware of and relied upon a taking of a portion of the property which was proposed several years before their purchase. They did, however, take advantage of what has been known as the first or free cut theory and practice as it relates to land use. As a result of that free cut, a parcel or building lot was created upon which the defendants located a home to be their daughter's, which parcel utilized most of what was shown as lot seventeen (17) on the proposed subdivision map.[2]
The second building lot lying to the north of the built upon lot, as represented by the owners, would, of necessity, be served by a septic system, and it was possible to locate that septic system between the road and the residence. Before the taking, Watertown amended its regulations requiring a setback of seventy-five (75) feet vice the fifty (50) foot setback that existed prior to that time. A septic system nevertheless CT Page 1042 could still be located between the road and the proposed residence despite the change in setbacks. After the taking, with the new highway line and the preexisting wetland intrusion, there was insufficient land to build a house with a septic system on that parcel. Prior to the taking and as a result of their sole ownership, the Smiths would have been able to re-subdivide the single free cut lot and the adjoining lot into two (2) lots of adequate configuration to create two (2) one-family residential lots with necessary setbacks, the availability of adequate space for a septic system and well, and ingress and egress thereto.
As a result of the taking, the easterly road line of Middlebury Road and the northerly road line of Bunker Hill Road were moved much closer to the one-family house in existence on the original free cut lot and markedly closer to the westerly boundary of the remaining land along Middlebury Road. In addition to the new proximity of the road lines, the grade of Middlebury Road was to be generally maintained to the prior grade upon the land taken, which significantly increased the elevation of the front yard of the existing house. On the southerly side yard of the existing house, Bunker Hill Road will be substantially elevated to the end that both parcels in the after condition will be "in a hole" by reason of that road construction. The road level for travel of vehicles on Middlebury Road in the after condition would be at an elevation equal to the front windows of the existing home and within forty (40) physical feet of the house itself, with slope lines and the grade on the southerly boundary along Bunker Hill Road similarly brought proximate to the house and raised in elevation.
Before the taking, the one-family home on the corner of Bunker Hill Road and Middlebury Road was substantially above the travel level of Bunker Hill Road and had the benefit of screening from Middlebury Road. After the taking, by reason of the change of elevation and proximity of the taking line, the elevation of Bunker Hill Road will be significantly elevated in proximity to the house and, from its present elevation and the elevation of Middlebury Road, although approximately in the same elevation as in the before condition, will be moved within forty (40) feet of the house, thus materially compromising privacy. As a consequence of the taking, the entire front yard of the remaining potential one-family lot on the east side of Middlebury Road will be eliminated, and there will be an insufficient area between the easterly line of the new relocated Middlebury Road and the wetlands in which to locate a house and septic system with appropriate setbacks and distances for each so that the use of such property as a single one-family lot will be lost irretrievably.
As previously found by reason of the location of the wetlands, there is no other adjoining land, except as a result of the resubdivision of lot CT Page 1043 seventeen (17), which can be attached to the potential second building lot on Middlebury Road to create a building lot. The owners had one potential building lot and one built upon lot on Middlebury Road before the take, and one built upon lot after the take, thereby losing one complete building lot in the process.
As a result of the taking, the proximity of Middlebury Road will be one hundred ten (110) feet closer to the existing residence from Middlebury Road, and Bunker Hill Road will be thirty-five (35) feet closer to the residence as it abuts Bunker Hill Road. The land taken reduces the existing one-family lot by approximately thirty-seven thousand (37, 000) square feet, and the remaining lot on Middlebury Road is reduced by approximately nine thousand (9000) square feet, for a total land removal by the taking of forty-five thousand eight hundred eighty-eight (45, 888) square feet. There is also a slope area affecting both properties of thirteen thousand one hundred (13, 100) square feet, with the slope grades ranging from a high of four (4) feet horizontal slope to one (1) foot vertical to an extreme slope of two (2) feet vertically to one (1) foot horizontally, and the top of the grade will have a guard rail installed along it. The existent planting protecting the house from Middlebury Road consisting of shrubs, bushes and brush, together with one large tree, will be destroyed and/or eliminated. Part of the fill necessary for the slope will impact the existing septic system fields. The total area taken, including two hundred thirty-seven (237) feet for construction of a driveway and eight hundred sixty-eight (868) square feet for a drainage easement from the highway, is over sixty thousand (60, 000) square feet between the taking and the slope rights.
As a consequence of the taking, the existent home will be placed below street grade so as to affect privacy and aesthetic appeal, and will increase the amount of water and the speed of the runoff which will occur from that existing in the before-taking condition. The driveway access to the one-family residence will be effected by the slope easement, and the homeowner will be required to reconstruct access at a more difficult grade from Middlebury Road to the house. Subsequent to and as a result of the taking, a second lot will no longer be physically possible and, thus, the highest and best use of that property after the taking will be that of excess land abutting the existing parcel with the home constructed thereon. That home will be affected by noise, dust and construction activities for approximately one year during the construction of the project, thereby, in theory, reducing its rental value and the value of the use and occupancy of that parcel for that approximate period of time. The court, however, finds no credible basis to invoke that reduction of rental value theory in this instance and ascribe a value thereon. It is not feasible to suggest that a reasonable buyer, fully knowledgeable of the facts, will pay the same amount of money to CT Page 1044 purchase two (2) parcels, otherwise identical, one of which will be impacted by construction activities including noise, dust and debris for one (1) year, and the other not subjected to such construction activities.
In the summer of 1999, the owners retained the services of Walter J. Kloss, a qualified, licensed and experienced real estate appraiser, to determine the loss of value occasioned by this taking as well as the assessment of damages therefor. He submitted a report, dated August 4, 1999, and expressed an opinion as to damages of forty-nine thousand five hundred ($49,500) dollars. The owners contend that his report, although commissioned by them, should be totally disregarded. They rely upon the proposition that "[t]he proper measure of damages is the difference between the market value of `the whole tract' as it lay before the taking and the market value of what remained of it thereafter." Gontarz v.Berlin, 154 Conn. 695, 697 (1967). Their reliance on Gontarz is an interpretation of what the court said, as opposed to explicit language. The court is satisfied with that interpretation and agrees with it. Their premise is further strengthened, however, by the fact that Mr. Kloss, admittedly, was unable to express any opinion of the value of the premises as of the date of the taking. The owners claim additional support with respect to their stance on the Kloss appraisal and analogize a taking date to a vesting of title date in a foreclosure proceeding. An opinion of value is inadmissible if that opinion is not the value on the legal date for ascertainment of value. In case an appraisal is presented upon a date other than the legal date, the date that title vests for valuation, it is inadmissible and improper for consideration by the trier. They cite to First Federal Bank, FSB v. Gallup, 51 Conn. App. 39
(1998). The analogy is somewhat interesting. The Kloss report does supply some interesting background reading, but is of no value and is not relied upon in any sense in this opinion.
 Nothing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony. Appeal of Cohen, 117 Conn. 75, 81, 166 A. 747; Fox v. South Norwalk, 85 Conn. 237, 242, 82 A. 642. Morgan v. Hill, 139 Conn. 159, 161, 90 A.2d 641. . . . The purpose of offering in evidence the opinions of expert witnesses as to such matters as land values is to aid the trier to arrive at his own conclusion, which is to be reached by weighing those opinions in the light of all the circumstances in evidence bearing upon value, and his own general knowledge of the elements going to establish it. Appeal of Cohen, 117 Conn. 75, 85, 166 A. 747. CT Page 1045
 Under our law, a state referee sitting as a court [of] appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of this court with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises.
(Internal quotation marks omitted.) Birnbaum v. Ives, 163 Conn. 12, 21
(1972). A rather interesting comment upon the duty of a state judge trial referee is set. forth in the following manner: "Until some appellate court says otherwise, the market value of real estate in eminent domain is what the referee says it is!" Pine Street Associates, Inc. v.Commissioner of Transportation, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 336736, (February 23, 1999,Belinkie, J.).[3]
 When determining the market value of land after a partial taking, the use made or to be made of the land taken is to be considered with regard to its effect upon the market value of the remaining land. Andrews v. Cox, 129 Conn. 475, 478, 29 A.2d 587; Andrews v. Cox, 127 Conn. 455, 458, 17 A.2d 507. The damages are determined as of the time of the taking, but they may include those damages which will result in the future from the use of the land taken. Andrews v. Cox, 127 Conn. 455, 459, 17 A.2d 507. "The different elements of damage to remaining land recoverable . . . are as numerous as the possible forms of injury. The mere fact that injuries will be temporary and incident to the period of construction only is no ground for disallowing recovery, since the purchaser might pay less if he knew such injuries were to be inflicted." 4A Nichols, Eminent Domain (3d Ed.) 14.24, p. 14-128.2; see Andrews v. Cox, 127 Conn. 455, 17 A.2d 507.
Bowen v. Ives, 171 Conn. 231, 238 (1976).
During the course of the hearing on this appeal, the court heard the testimony of two additional appraisers as well as the discredited opinion of Walter Kloss. The Commissioner offered the opinion of Anthony John DeLucco, who the owners claim is not truly an independent appraiser, but someone hired by the plaintiff who is on a salary and performs a service CT Page 1046 in return for said salary. It must be recognized that this hardly disqualified Mr. DeLucco, but does suggest an interest in the ultimate result of this appeal. The owners rely on the testimony and the appraisal of Roy L. O'Neil, whom they retained and whose testimony falls within the category of an expert hired to advance the cause of his clients.
The DeLucco testimony and report clearly indicate that he used both the sales comparison approach and the cost approach in his determination of the value of the taking and the assessment of damages therefor. He gave each equal weight in determining the final fair market value. He did not acknowledge the existence of an additional building lot prior to the take. It was his opinion that the size of the area alleged to be a second building lot was not large enough with enough room to accommodate a well and a septic system within its bounds. His reason for this predicate is the topography of the area as well as the soil conditions which substantially impact the wetlands.
His opinion of the fair market value prior to the take was two hundred fifteen thousand ($215,000) dollars. He expressed an opinion as to the fair market value of the property after the take, and declared his opinion to be one hundred seventy-seven thousand ($177,000) dollars. He broke down that figure. The total taken area was thirty-six thousand eight hundred eighty-eight (36, 888) square feet, and he ascribed the value of the lot at fifty-five thousand ($55,000) dollars at that time. After the take, it was his opinion that the lot value was forty thousand ($40,000) dollars, the components of which include a lump sum for a slope easement of twenty thousand ($20,000) dollars, a contributory value of site improvements located in the take and slope easement areas (wall, trees, grass and driveway) of two thousand ($2000) dollars, and a severance recognition and award of fifteen thousand ($15,000) dollars. With the adjustments he considered relevant, he arrived at the assessment of total damages at thirty-eight thousand ($38,000) dollars. In addition thereto, he valued the controversial second building lot, which he describes as parcel number two (2), at two thousand two hundred ($2200) dollars. The sum of which values amounts to forty thousand two hundred ($40,200) dollars, according to the Commissioner of Transportation.
The O'Neil appraisal, as set forth in his testimony and in his report, recognizes two distinct building lots. The first is the existing construction, and the second is the so-called questionable second lot. The existing property occupied by the owners' daughter may be described, with some poetic license, as standing on what was designated as lot seventeen (17) on the Stablegate subdivision. He recites that that house has been located in such a manner that, under the continued ownership, the property could readily be resubdivided to adjust the lot line to create a second lot in the area of what was previously designated as lot CT Page 1047 number eighteen (18) on the same "Stablegate" plan. The entire parcel had previously been approved for the proposed subdivision which included the two lots with which this appeal is concerned, but that approval has expired and only one lot has actually been developed using that free "first cut." It is possible to realign the lot line for a free cut again to provide adequate uplands for the development of a second lot along the lines as were previously approved. There has been a change as noted, however, in the wetlands setback standard, which was increased from fifty (50) feet to seventy-five (75) feet since the approval of the previous subdivision. The second house to be constructed, if it were to be constructed on the second building lot, may well be located closer to the front of the property but be designed as a two-story structure with a smaller footprint. Such a configuration would not be inconsistent with other lots on Middlebury Road. In his opinion, the highest and best use is considered to be continued single-family use of the lot with a resubdivision of the parcel to create a second lot along the lines as were previously approved. He, too, chose to utilize the sales comparison approach with respect to the valuation of the land and the cost approach for a determination of the value of the building improvement standing thereon.
The owners called a civil engineer to testify on their behalf He was most knowledgeable, articulate and well qualified which, together with his demeanor, convinced this court that his testimony was highly credible and reliable. It was his opinion that the property lying immediately north of the built upon Lot would permit the construction and erection of a second home thereon prior to the taking. There was a question of the location and ability to locate a septic system on that parcel, and his explanation and justification for his opinion that such was possible was found to be both logical and persuasive. He was unequivocal in his position that after the taking the building lot in issue would be compromised and not buildable.
The issue of the existence of a second building lot is the central and perhaps the most important issue to be found in this appeal. In accordance with the foregoing, the court does, indeed, find that prior to the take, there was such a building lot and that it had value as such; and subsequent to the take, its value as a building lot was destroyed. Clearly, this enhances any award of damages and increases the assessment which was previously made. A trial court may seek aid in the testimony of experts but must ultimately make its own independent determination of fair compensation on the basis of all of the circumstances bearing upon value. Commissioner of Transportation v. Towpath Associates, 255 Conn. 529,541 (2001). "[T]he trial court is free to select the method of valuation most appropriate to the case before it." D'Addario v. Commissioner ofTransportation, 180 Conn. 355, 365 (1980). The paramount legal principle CT Page 1048 involved in an eminent domain proceeding is that just compensation is an equitable, rather than a strictly legal or technical one, and the law intends that the condemnee be put in as good condition pecuniarily by just compensation as he would have been in had the property not been taken. Colaluca v. Ives, 150 Conn. 521, 530 (1963).
Having made this finding, the O'Neil appraisal report, recognizing and valuing the second building lot, becomes the more compelling appraisal of the two being considered. The value of the property prior to the proposed taking and roadway construction was valued at two hundred eighty-two thousand ($282,000) dollars. That value is distributed approximately at one hundred seventy-four thousand ($174,000) dollars to the building and site improvements, seventy-five thousand ($75,000) dollars to the prime building site associated with the home, and thirty-three thousand ($33,000) dollars to the excess land and potential additional lot. The taking removes the best lands.from the site and leaves the remainder lands with limited yard utility, a reduced privacy amenity and diminished development potential. The impact of the several changes in the property size and character has reduced the market value after the take to one hundred eighty-eight thousand seven hundred fifty ($188,750) dollars. The total damages found in the O'Neil appraisal which were associated with the take are said to be the difference between the market value before and the market value after the take, of ninety-three thousand two hundred fifty ($93,250) dollars plus the temporary damages due to construction. The court finds those temporary damages to be fifteen hundred ($1500) dollars, rather than the three thousand ($3000) dollars set forth in the report. The total of those figures produces an award or an assessment of ninety-four thousand seven hundred fifty ($94,750) dollars.
Judgment may enter that the owners recover and receive the sum of ninety-four thousand seven hundred fifty ($94,750) dollars of the State of Connecticut, together with an appraisal fee of twenty-two hundred ($2200) dollars which is found to be fair and reasonable, but subject to and reduced by such funds previously paid into the court and paid over to the owners.
Moraghan, J.T.R.
 APPENDIX 1
All that certain tract, piece or parcel of land situated in the Town of Watertown, County of Litchfield and State of Connecticut, on the easterly side of Present Middlebury Road and the northeasterly side of Present Bunker Hill Road, containing 4, 263 square meters, more or less, bounded and described as follows and shown on the map hereinafter referred to: CT Page 1049
SOUTHWESTERLY — by Present Bunker Hill Road, 108.879 meters; SOUTHWESTERLY — by the intersection of Present Bunker Hill Road and Present Middlebury AGAIN Road, along an arc of a curve, 57.892 meters; WESTERLY — by Present Middlebury Road, 131.136 meters; NORTHERLY — running to a point; NORTHEASTERLY — by Owners' remaining land, along an irregular line, a total distance of 279.768 meters, by a line designated "TAKING LINE" as shown on said map.
Said premises are taken together with the following easements and right under, over and across portions of the Owners' remaining land:
A full and perpetual easement to slope for the support of the highway within an area of 1, 217 square meters, more or less, located between and opposite Station 0+ 024 right, Center Line, Present Bunker Hill Road, and Station 0+ 237, right, Center Line, Present Middlebury Road, as shown on said map.
A full and perpetual drainage right of way easement within an area of 80.7 square meters, more or less, located between and opposite Stations 0+ 269.893 and 0+ 276.280, right, Center Line, Present Middlebury Road, as shown on said map.
A right of entry to construct driveway as more particularly shown on said map. Said right shall terminate automatically upon completion of said work by the State.
Said premises are more particularly delineated on a map entitled: "TOWN OF WATERTOWN MAP SHOWING LAND ACQUIRED FROM ROBERT C. SMITH et al BY THE STATE OF CONNECTICUT DEPARTMENT OF TRANSPORTATION BUNKER HILL ROAD MIDDLEBURY ROAD JUNE 1998 JAMES F. BYRNES, JR. P.E.-TRANSPORTATION CHIEF ENGINEER." Revised 3/10/99, Sheet I of 1 (153-110-1).
The above-described premises are taken subject to such rights and easements as appear of record.
The premises taken herein are portions of the premises contained in a Quit Claim Deed dated May 10, 1993 and recorded in Volume 697 at Page 18 of the Watertown Land Records.
Said premises stand on record in the names of Robert C. Smith and Cathy E. Smith.