WILLIAM J. THORNTON ET AL. v. WILLIAM J. COX,
HIGHWAY COMMISSIONER

SUPERIOR COURT        HARTFORD COUNTY        FILE NO. 76733

Memorandum filed April 19, 1949

*Alcorn, Bakewell & Alcorn,* of Hartford, for the Plaintiffs.

*William L. Hadden,* Attorney General, and *Bernard A. Kosicki,* Assistant Attorney General, of Hartford, for the Defendant.

MELLITZ, J. The property here involved and taken for the layout  and construction of the Wilbur Cross Parkway is a part of land owned by the plaintiffs upon which they have conducted

an extensive sand and gravel business for a number of years. Another parcel of land owned by the plaintiffs allegedly has been completely isolated as a result of the taking. The referee has found that before the taking the plaintiffs owned in both parcels 24.69 acres of land which contained good sand and gravel deposits and that as a result of the taking there was left to the plaintiffs 7.86 acres. The highway commissioner assessed the damages for the taking as $13,800. The referee concluded that the plaintiffs sustained damages aggregating $336,679.95; and in an alternative finding he computed the damages as $519,411.15.

The principal attack upon the report of the referee is centered upon the method employed by him to ascertain the amount of the damages.

The finding recites that in one acre of land having a depth of sixty-five feet there are 104,866.32 cubic yards of materials; that the minimum value of the sand and gravel deposit as it lay in the bank unmoved and untouched was 25 cents a cubic yard; that each sand and gravel acre was therefore of the value of $26,216.58; and that the fair market value of the sand and gravel in the land taken and in the parcel isolated was $427,592.42. The referee then found that in view of the history of the operations of the plaintiffs in conducting their business it would have taken twenty-one years to extract the deposits of sand and gravel owned by the plaintiffs; and, in order to find the value of the sand and gravel at the time of the taking, he applied a discount rate of 4 per cent, compounded annually, and found the present worth of the sand and gravel in the land taken and in the parcel isolated to be $244,861.85. The referee further found that the loam on the isolated parcel had a value of $1 a cubic yard as it lay on the ground, and he fixed the fair market value of the loam on this parcel as $10,970.64. To these sums he added $80,847.46 for consequential damages to the plant and equipment, making the total damage found $336,679.95. The alternative finding of the damage as $519,411.15 was without application of the discount rate.

It is evident that in pursuing this method to ascertain the damages the referee was acting under a misconception as to the proper application of the rule involved in determining the damages where land taken by eminent domain contains valuable mineral or other deposits.

Where land taken contains minerals or other valuable deposits, the measure of compensation is the market value of the land with the minerals or other deposits in it, and not the value of the deposits considered separately as merchandise. *Hollister v. Cox,* 131 Conn. 523, 526. The fact that the land contains valuable deposits is to be considered as an element in determining its market value, just as consideration is to be given to every other relevant factor which may have a bearing on the market value; but it is the market value of the land that remains the test.

Accordingly, the referee properly could consider, together with all the other relevant evidence bearing on the question of value, the evidence before him shedding light on the extent to which the value of the land was enhanced by the presence in land of the deposits of sand and gravel. This does not mean that it was permissible for him to compute the value of the sand and gravel estimated to be contained in the land and treat the amount so computed as the amount of the damage sustained by the taking. Of this method of ascertaining the damage, Orgel on Valuation under Eminent Domain (p. 544) says: "But more often the owner contends that the proper way to arrive at the market value of the property is to estimate the amount of stone in situ and to multiply this amount by a fixed price per unit. This method is uniformly rejected."

The harm in this method of ascertaining the damage is found by the authorities to lie in the fact that it is based on assumptions as to annual productivity over a long period of years, fixed future sale prices of the product, and numerous contingencies, uncertainties and speculative elements. *Hollister v. Cox,* supra; *Sparkill Realty Corporation v. State,* 268 N. Y. 192; *Searle v. Lackawanna & B. R. Co.* 33 Pa. 57.

It was not permissible for the referee to treat the sand and gravel extractable from the plaintiffs' land as so much sand and gravel and base his determination of the fair market value of the land upon a computation of the value of the sand and gravel extractable from it. The fact that the land contains a valuable deposit of sand and gravel which may enhance its value is an element to be taken into consideration in fixing its fair market value, and for this reason testimony as to the quantity and value of the sand and gravel estimated to be contained in the land may be received in evidence. As was said in *Seattle & M. R. Co.* v. *Roeder,* 30 Wash. 244, 263, "This land has a special value as

stone-producing land. The owners, therefore, are entitled to compensation according to its value as such . . . . While the profits or price or value of the minerals, if the minerals them-selves are taken out, may not be considered, yet the value and extent and quality of the stone . . . as it exists upon the land may be considered. Lewis, Eminent Domain, § 486. If the extent and quality and value of the stone as it lies on the land may not be considered, there would be no way by which the value of the land with the stone could be shown. All legitimate evidence tending to establish the value of the land with the mineral in it is permissible."

It is clear from the findings of the referee in paragraph 82, 83, 84, 85, 86, 89, 107, 115, 117, 118, 134, 135, 137, 138, 139, 141, 142, and 143, that his conclusions as to the damages sustained by the plaintiffs for the taking of their land, exclusive of conse-quential damage to installations, were based soley upon his com-putations of the value of the extractable sand and gravel as so much sand and gravel, to the exclusion of all other evidence be-fore him as to the fair market value of the land as land con-taining deposits of sand and gravel.

The danger from the speculativeness and misuse of evidence as to the estimated quantity and value of deposits extractable from the land has led some authorities to exclude testimony as to such estimates. Orgel, Op. Cit., p. 544; *Searle* v. *Lackawanna & B. R. Co.,* supra. In *Los Angeles* v. *Deacon,* 119 Cal. App. 491, it was held that after a witness has given an opinion as to the market value of the land he may be asked questions on cross-examination relative to the quantity and value of the de-posits in it to test the value of his opinion as to market value and not as a basis for computing market value. However, as pointed out in *Campbell* v. *New Haven,* 101 Conn. 173, 183, all elements relevant and material to the question of the market value should be admissible on direct examination, but care must be exercised to distinguish between the elements of damage and the measure of damage. In determining market values for land taken, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land. The determination of the damages to be paid requires the consideration of everything by which the value is legitimately affected. *Andrews* v. *Cox,* 127 Conn. 455, 458. In *National Brick Co.* v. *United States,* 131 F. 2d 30, 31, in a proceeding to condemn sand land, it was held that testimony as to the quantity and quality of the sand and its value in its na-

tural condition in the land at the time of taking was admissible to enable the jury to apply the correct standard of value of the land with regard to the best use thereof. See also *United States* v. *Rayno*, 136 F. 2d. 376, 379, (certiorari denied, 320 U. S. 776); and *Sparkill Realty Corporation* v. *State*, 4 N. Y. S. 2d 679, 683, (aff'd, 279 N. Y. 656).

The use by the referee of the testimony introduced as to the estimated quantity and value of the sand and gravel in the land to compute the damage sustained by the plaintiffs resulted in the application of an incorrect principle to fix the amount of the damage sustained by the plaintiffs from the taking.

In paragraph 132 of the report the referee has found that the plaintiffs are entitled to $80,847.46 for consequential damages to the processing plant, batching plant, and heavy equipment employed in their sand and gravel business. The heavy equipment, as to which the damage was found as $41,877.68, consists of shovels, bulldozers, Euclid trucks, etc. A taking of real estate by eminent domain does not affect the ownership of personal property kept on the premises taken, and compensation cannot be recovered for damages resulting to personal property not annexed to the land. 1 Nichols, Eminent Domain (2d Ed.) p. 697; *People* v. *Isaac C. Johnson & Co.*, 219 N. Y. S. 741 (aff'd. 245 N. Y. 627, certiorari denied, 275 U. S. 571). Furthermore, in paragraphs 125 and 126 the referee finds that additional burdens and expense to which the plaintiffs will be subjected in carrying on their business in the future are contributing factors to the consequential damage found to the heavy equipment and the batching plant. There are many business losses which may result from the condemnation of property and which are not compensable. *United States ex rel. T. V. A.* v. Powelson, 319 U. S. 266, 281; *Mitchell* v. *United States*, 267 U. S. 341, 345. The elements referred to in paragraphs 125 and 126 were not considerations to be taken into account in ascertaining the consequential damage to installations as found in paragraph 132 of the report.

As to subdivision A of the remonstrance, paragraph 1 attacks the finding of the referee in paragraph 9 of the report that the taking of parcel No. 2 completely isolated 10.2 acres of the plaintiff's land lying westerly of the take. The report treats this 10.2-acre parcel as completely taken and no value is ascribed to it after the taking. The evidence is that access to this parcel

to and from Tolland Turnpike along a strip 7.68 feet wide remained after the taking. While this limited access was not sufficient for the vehicles employed by the plaintiffs in their sand and gravel business and may have rendered the tract valueless to the plaintiffs in their sand and gravel business, the land, with such access as remained to it, continued in the ownership and possession of the plaintiffs and had some value after the taking which should have been ascertained and considered in fixing the damage sustained by the plaintiffs.

Paragraphs 1, 29, 30, 31, 32, 35, 46, 49, 50, 51, 52, 53, 55, 56, 58, 59, 61, 62, 63, 64, 65, 66, 67, 68, 69, 71, 72, 73, 74, 75, 76, 77, 78, and 79 of subdivision A; paragraphs 1, 2, 3, 5, 35, 36, and 65 of subdivision B; paragraphs 10, 12, and 16 of subdivision D; and paragraphs 12, 13, 14, 15, 22, 30, 34, 35, 43, 57, 61, 67, 69, and 73 of subdivision R, of the remonstrance, are sustained.

The report is recommitted to the referee for correction in the light of the foregoing.