[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
I. PROCEDURAL BACKGROUND
This vigorously contested condemnation action was commenced under the authority of Chapter 132 of the General Statutes when the City of New London, acting by the New London Development Corporation, ("city" or "Condemnor,") filed a Statement of Compensation with the clerk of this court on October 24, 2000 to acquire property known as 82 Trumbull Street. New London, Connecticut (the "subject property") and owned by the defendant Foss Bourke, Inc. ("Defendant" or "Foss Bourke"). The Condemnor claimed that the fair market value to be paid to the persons entitled thereto as compensation for the taking of the subject property was $336,000.00, and deposited that sum with the clerk of this court and took title to the subject property.
On January 2, 2001, the defendant filed an Appeal and Application for Review of Statement of Compensation claiming to be aggrieved by the Statement of Compensation. Later Foss Bourke filed an Amended Appeal and Application for Review of Statement of Compensation on April 4, 2001. The Amended Appeal added the allegation that certain listed property alleged to be fixtures or trade fixtures were taken in addition to the previously defined property.
In its Amended Appeal Foss Bourke claimed it did not receive just compensation for the subject property and it did not receive any compensation at all for the property identified in Paragraph 3 of the Amended Appeal.
The Condemnor denied that it had taken any property other than the subject property and denied that it had taken the property described in Paragraph 3 of the Amended Appeal and the issues were joined. The parties stipulated that the case should be heard by this court to which the case had been referred notwithstanding the provisions of Section 48-10 and 8-132
of the General Statutes. CT Page 14532
Thereafter, this case was tried to this court on August 21, August 28 and August 29, 2002. The court had earlier viewed the subject property in the presents of counsel for the parties on May 22, 2002. Briefs were filed by the parties thereafter on September 26, 2002.
II. COURT FUNCTION
The responsibility of the court in a condemnation case is governed by federal and state constitutional provisions and Chapters 130 and 835 of the General Statutes. The role of the judge or referee is such cases has been often detailed by our Supreme Court in cases such as ConnecticutPrinters, Inc. v. Redevelopment Agency, 159 Conn. 407 (1970) and will be reviewed below. Suffice it to say here that, following those well established procedures, this court has the responsibility to make its own independent determination of just compensation for the taking.
III. THE TRIAL
At the trial both parties were well represented by counsel who presented witnesses, advanced arguments and filed briefs in support of their respective positions.
Foss Bourke presented the testimony of its president, Peter Foss, through whom several exhibits were introduced. He claimed that there was a business operated from the site of the property and another piece of property across the street at 95 Trumbull Street which was on the waterfront. He testified that his company was involved in the sale of seafood wholesale on the site and retail through the internet as well as the sale of bait to commercial fishermen. The property at 95 Trumbull Street, which he testified was involved in the business because of its docks on the water and the office space in the building was actually owned by different owners. It is found that the 95 Trumbull Street property was not described in the taking documents filed by the city. Harbor Industrial Development Corporation was the owner of 95 Trumbull Street at the time of the condemnation of the Foss Bourke subject property. Plaintiffs Exhibit 1, which is the New London Tax Map, shows the 82 Trumbull Street property as #105-13 and the 95 Trumbull Street property as #68-15. Mr. Foss also outlined improvements which were made to the structure of the building and to various equipment acquired when starting the business which was conducted at 82 Trumbull Street and 95 Trumbull Street.
Anthony Rusciano from Benchmark Consulting Appraisers, Inc. of Scarsdale, N.Y. was presented as a witness for Foss Bourke. His CT Page 14533 "Fixture Appraisal" was introduced as Defendant's Exhibit 10. His evidence addressed what he called "trade fixtures" broken into various categories of fixtures, machinery, equipment and other assets of the business operated at the two locations indicated above by Foss Bourke. The definition of a "trade fixture" in his report is "An item installed or placed as part of a process to serve the needs of a business operation which may be physically annexed to the realty, custom fit to be part of an integrated system intended to be permanent or which would loose substantial value upon removal." He included motor vehicles, computers, desks, chairs and "tangible intangible" assets such as promotional materials, brochures and flyers in stock, costs of creating a website on the internet and the value of seafood on hand at that time. His "sound value" for these various assets at the time of the city's taking of 82 Trumbull Street was $1,030,198. His report defines "current sound value" as: "The current reproduction cost less observed depreciation as of the valuation date of this report."
The city in effect claimed that none of the items listed in his appraisal were in fact part of the property condemned or described as the subject property. On cross-examination the city introduced various correspondence (Plaintiffs Exhibit 2) by which the parties attorneys discussed their respective positions relating to these items. In this exhibit the city told the attorney for Foss Bourke that it did not consider that it took any fixtures, machinery or equipment that can be removed from the building and would consider any such property remaining at the time the building was demolished to have been abandoned. There was no testimony as to exactly what was remaining at that time except that the court did make observations at the time of the viewing on May 22, 2002. That exhibit did include a letter providing a listing by Foss Bourke of items it sold totaling $12,571 including such items as trucks. forklifts, time clocks, crates, computer and printer; but the city's response indicated it did not claim an interest in such hems as a result of the condemnation. On cross-examination the witness acknowledged he did not attempt to give an opinion as to "fair market value" of any of the items listed in his report.
Mark Nadeau testified for Foss Bourke and provided a more traditional appraisal of the subject property. His opinion of the value of the subject property at the time of taking is $710,000. He broke it down to $450,000 for the site alone and $260,000 for the shell or structure. He used the comparable sales approach for the site (at pages 38-56) and the cost approach for the contributory value of the structure. (At pages 58, 59). He did (at page 23) indicate in his report that the property had "water rights" by license which enhance the value because the waterfront property across the street was "owned by the same entity." CT Page 14534
This is found by the court to have been inconsistent with the other evidence accepted by the court. In his later testimony he testified he did not attribute any value to those rights. On cross-examination this appraiser acknowledged that he had not taken into consideration that you can see the waste water treatment plant from the site but said it was a non-issue since there is a view of the water in the other direction. (Peter Foss testified that the smell from the plant was stronger at the beginning but was less in 2000.) This witness did not treat as separate items the elevator, loading dock, doors and windows indicating that they where an "integral part of the building". Contrary to the testimony of Mr. Rusciano, also offered by Foss Bourke, this witness testified that the intended purpose of the use by the buyer is what determines value, not the use being made by the seller at the time of a sale, as he discussed his comparable sales.
The city presented the testimony and report of Stephen Flanagan to support an appraisal of $336,000 for the subject property at the time of the taking. His testimony indicated that he considered that the site had no parking, overlooked the sewer filtration plant and was in flood plain zone A7 as factors he considered. He contrasted his approach with the Foss Bourke appraiser, especially as it related to the significance of the improvements on the properties used for comparable sales comparisons. He also, however, did use the cost comparison approach in determining his opinion of value. His report contains several approaches to arriving at a value, claiming that each provided support for the opinion offered. On cross-examination he was required to agree that some sellers may consider the threat of eminent domain to be an undue stimulus and if so it may affect the value/price of property acquired. Also on cross-examination he acknowledged that the Pfizer activity in the area of the subject property was a positive external force which affect the value of the subject property. He did not, however, find purchases by Pfizer to have been at "market value" and did not place weight on them in forming his opinion of value. He utilized in his report an extensive analysis of sales to the New London Development Authority, which has the power of eminent domain, and did place weight on some of these sales in forming his opinion of value.
IV. WHAT PROPERTY WAS TAKEN; THE CLAIMS OF THE PARTIES.
Part of the issue presented in this case by the parties is related to a determination of exactly what was "taken" as part of this condemnation. Foss Bourke claims the court must value essentially all the assets of the company, even those located at a different site (not owned by the defendant) where a part of their business was conducted, because it CT Page 14535 claims to be entitled to compensation for all of its "loss" as a consequence of having to shut down its business when the property at 82 Trumbull Street was condemned by the city. In this case it claims to have lost its business. In some way the defendant seems to be arguing that the assets inventoried by Mr. Rusciano are all included in what we have traditionally called "fixtures". They are, however. claimed to be "trade fixtures" by the witness. This includes, as indicated above, things like a computer and printer located in their office across the street in a building owned by someone else. Also included in the analysis are items of an intangible nature like the design of a web site for their retail business. Motor vehicles are included because they were used in the business.
Although as indicated above one of the exhibits includes some correspondence about the sale of some of the inventoried items, there was no attempt to account for all of it by the defendant.
Although the defendant cites the court to many foreign decisions and treatises in its argument, the Connecticut springboard for this analysis seems to be cases such as Greyline Bus Company v. Greater BridgeportTransit District, 188 Conn. 417, 427 (1982) where the court considered the "loss to the owner" not the value to the condemnor in determining the damages to be awarded. Also the defendant cites the court to the definition of a fixture in, Toffolon v. Avon, 173 Conn. 525 (1977). The defendant claims the benefit of cases such as Wronowski v. RedevelopmentAgency of the City of New London, 180 Conn. 579 (1980), where it was held that a court must consider the unique nature of the property taken as well as the use to which the property is put. The court in that case, however, also said: "When real property is condemned the general rule is that nothing should be included in the award in the way of compensation for the loss of a business conducted thereon unless specifically authorized by statute; however, where an ongoing profitable business is conducted on the land, such a use should be considered if the use is a factor in establishing market value because a willing buyer might offer more for the property since such a business use would indicate the suitability of the location for a similar enterprise . . . (citing cases)" At 584.
The city, on the other hand, claims that Foss Bourke cannot recover for the value of its personal property because none was taken. As illustrated by paragraph 4 of the Statement of Compensation, the only property taken in this action was the subject property. The city claims that the Amended Appeal illustrates this fact where in Paragraph 2, Foss Bourke refers to the legal description of the subject property attached to the Statement of Compensation. in Paragraph 3 of the Amended CT Page 14536 Appeal, it is claimed, Foss Bourke alleged that certain "fixtures and trade fixtures" and other "intangible and tangible", personal property was taken, but it failed to allege — and failed to prove at trial — that the Condemnor included these items in its Statement of Compensation and Certificate of Taking.
The city cites the court to the case which says: "The [condemnee] could not have lost its rights as owner of the machinery and other personal property in the buildings unless the record of the condemnation proceeding reasonably would support such a conclusion." ATC Partnership v. Windham,71 Conn. App. 438, 445 (2002). The evidence here, the city contends, shows that the Condemnor asserts no such claim over any personal property within the subject property, and the records of this action show that only the real property was condemned.
The city asserts it is settled law that "[a] taking of real estate by eminent domain does not affect the ownership of personal property not annexed to the land." Wm. J. Thornton v. Wm. J. Cox, 16 Conn. Sup. 150,154 (1949).
Also the city claims a taking of a business under Chapter 132 results in a forced relocation of that business, not a forced sale of the fixtures, trade fixtures and other "intangible and tangible" personal property used in that business. Foss Bourke's remedy for any loss in this area the city alleges is to seek relocation benefits as allowed under the Uniform Relocation Assistance Act, General Statutes § 8-266, et seq. The remedies allowed under that act include recovery of "actual direct losses of tangible personal property as a result of moving or discontinuing a business." General Statutes § 8-268 (c).
The city has cited in its brief the case which says: "It is in accord with the view of most authorities that injury to or even the destruction of a business conducted on land taken by eminent domain is not to be considered a separate element of damage in the condemnation proceeding although the special value of the land owing to its adaptability for use in a particular business is an element which the owner of land is entitled to have considered in the determination of the amount to be paid as just compensation for the taking of the land." Seferi v. Ives,155 Conn. 580, 584 (1967).
In addition the city argues that to the extent that any items of property identified in the Fixture Appraisal may be considered as true fixtures, those fixtures are integral parts of the real property and are subsumed in the determination of the value of the subject property. It cites the court to cases that say: "The taking authority must pay the CT Page 14537 value of what it takes. To the extent that the value of the real propertyas a whole may be enhanced by the alleged fixtures annexed thereto, the value of the fixtures must be included in what the taking authority pays. . . ." (Citation omitted; emphasis added.) Jones v. New HavenRedevelopment Agency, 21 Conn. Sup. 140, 143 (1958). This is bases on the underlying argument of the city that if items of personal property are fixtures, "the personalty becomes part of the property and they are considered realty." Vallerie v. Town of Stonington, 253 Conn. 371, 372
(2000).
Furthermore, the city claims, Chapter 132, under which this condemnation was authorized, defines "real property" as "land, subterranean or subsurface rights, structures, any and all easements, air rights and franchises and every estate, right or interest therein." (Emphasis added.) General Statutes § 8-187 (9) and therefore they would not be authorized by law to condemn such personal property.
The city gives the court another reason to disregard Mr. Rusciano's testimony. His entire testimony and his Fixture Appraisal it claims are based on arriving at the "current sound value" rather than the fair market value of the items he appraised. Referring to his testimony it sets out these questions and answers:
 Q. So all of these dollars that your ascribing to these pieces of equipment and various other things you call fixtures are not market value; is that correct?
A. That's correct. I said that at the beginning.
. . .
 Q. Have you been asked to determine what the market value of these fixtures is?
A. No, it's not appropriate.
Q. So you have no idea what the market value of these fixtures is?
A. I didn't evaluate it that way.
Transcript, August 21, 2002, pp. 140-41, 143.
The city then quotes a recent case to illustrate its argument:
"We have stated repeatedly that the amount that CT Page 14538 constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. . . . In determining market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land. . . . The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use. . . ."
(Citations and internal quotation marks omitted.) Northeast Ct. EconomicAlliance v. ATC Partnership, 256 Conn. 813, 828 (2001).
V. CONCLUSIONS; FINDINGS
"It is the court's duty to award just compensation to an owner whose property is taken for public use." Wronowski v. Redevelopment Agency, supra, 180 Conn. 585. As noted above, the court in this case is required to determine the fair market value of the real property taken in this case. The determination of just compensation for a taking is an equitable one, and the court is entitled to consider a wide range of factors in reaching its conclusion:
"The question of what is just compensation is an equitable one rather than a strictly legal or technical one. The paramount law intends that the condemnee shall be put in as good condition pecuniarily by just compensation as he would have been in had the property not been taken . . .
We have stated repeatedly that the amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. . . . In determining market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fur price of the land. . . . The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use. . . . The highest and best use concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate. . . . In determining its highest and best use, the trial referee must consider whether there was a reasonable CT Page 14539 probability that the subject property would be put to that use in the reasonably near future, and what effect such a prospective use may have had on the property's market value at the time of the taking. . . .
Because each parcel of real property is in some ways unique, trial courts must be afforded substantial discretion in choosing the most appropriate method of determining the value of a taken property. . . . In condemnation hearings, the state referee sitting as a court [of] appeals . . . is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of this court with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, "his general knowledge and his viewing of the premises. . . ." (Citations and internal quotation marks omitted.)Northeast Ct. Economic Alliance v. ATC Partnership, supra,256 Conn. 828-30, citing inter alia French v. Clinton, 215 Conn. 197,200-201 (1990).
"When the land and buildings taken have a market value, that must serve as the measure of damages; if there be no market value, [their] value . . ., must be ascertained in some other rational way . . . from such elements as are attainable." (Citations and internal quotation marks omitted.) Commissioner of Transportation v. Towpath Associates,255 Conn. 529, 542 (2001).
"The amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. . . . The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course that a market exists for such optimum use. . . . The highest and best use of a given parcel contemplates the use which will most likely produce the highest market value, greatest financial return, or the most profit. . . . In determining its highest and best use the trial referee must consider whether there was a reasonable probability that in the reasonably near future the subject property would be put to that use, and the effect, if any, that such a prospective use may have on market value at the time of the taking." (Citations and internal quotation marks omitted.) Commissioner ofTransportation v. Towpath Associates, supra, 255 Conn. 540. "[T]he condemnor is not required to pay the landowner for elements of value that may arise solely by virtue of the condemnation." (Citations omitted.)Id., 542. Unless it can be properly determined that "it was reasonably probable that someone other than the [Condemnor] would have assembled these properties in the near future," consideration of the effect of the taking as part of the planned development would be erroneous. Id., 551 CT Page 14540 "The general rule is that the loss to the owner from the taking, and not its value to the condemnor, is the measure of the damages to be awarded in eminent domain proceedings.". Gray Line Bus Co. v. Greater BridgeportTransit District, 188 Conn. 417, 427 (1982).
It is found that the subject property is located at 82 Trumbull Street, New London in the Fort Trumbull area in the heart of the redevelopment area where the new Pfizer development is built. (Def's Exhibit 14). It is found that the subject property contains a multi-story brick mill building that, at the time of the taking, was mostly vacant with the lower level used as a lobster pound. Transcript, August 28, 2002, p. 119. It is found that the land area is 9, 100 square feet, and the building contains 22, 399 square feet. Plaintiffs Exhibit 5 pp. 25, 28. The building takes up virtually the entire site. Transcript, August 28, 2002, p., 80. The building was built in 1918 and was in average condition for its age and was outdated. Id., pp. 6, 119. There was no parking on the site. Id., p. 119. The building overlooked both New London Harbor and the sewer filtration plant. Id. The sewer filtration plant is "a significant value influence on this neighborhood." Id., 120 The entire site is located in the A-7 flood zone, which means it is in the 100-year flood plain. Id., 123 125. It is found that the site is also in New London's C-1 general commercial zone. Id., 11. It is found that the defendant was at the time of the taking engaged in wholesale and retail sales and distribution of seafood and related products, including lobster, scallops, stuffed clams, shrimp cocktail, oysters and seafood chowder. The defendant wholesaled seafood to local and out of state businesses and retailed seafood over the internet. The defendant also sold bait to commercial fishermen. Those business activities were conducted in two locations separated by Trumbull Street, only one of which was owned by the defendant and was condemned. The property at 95 Trumbull Street, located diagonally across the street, was the waterfront property with docks for unloading seafood products and the building with the office from which the office work of the business was conducted. The property at 82 Trumbull Street which was condemned by the city is found to have been a lobster pound where storage of the produce was maintained and from which orders were prepared, packaged, packed and shipped. All work was done on the first floor, with the upper floors vacant. The subject property had been acquired several years prior to the condemnation and many improvements or alterations were done at that time to the structure to accommodate the business activities. Also at that time it is found that the defendant acquired considerable equipment specific to the business some of which was located in the structure condemned. After the condemnation the defendant discontinued the business. At the time of the condemnation it is found that there were various supplies on hand, including advertising material. No evidence was offered at trial nor CT Page 14541 argued by the parties as to the profitability of the business and no finding is made in that regard.
The court finds that the highest and best use of the subject property for purposes of establishing a fair market value is its then-current use as a lobster pound.
Mr. Nadeau and Mr. Flanagan reached similar conclusions about the value of the building. Mr. Nadeau considered that the building was worth $260,000. Transcript. August 28, 2002, p. 20. Mr. Flanagan considered that it was worth $263,000. Transcript, August ) 9 p002, p. 233. The court will adopt the analysis of Mr. Flanagan offered by the city and find the fair market value of the building to be $263,000 at the time of the taking for the reasons he has given. The significant difference between the parties rests with their widely disparate opinions of the value of the land and the question relating to the so-called "trade fixtures". Mr. Nadeau on behalf of the defendant considered that the land was worth $450,000, using a value of $50.00 per square foot. The city's expert, Mr. Flanagan, considered that it was worth $73,000, using $8.00 per square foot. While other approaches were reviewed, both experts utilized the comparable sales approach which in theory the court finds to be the best method to reach the fair market value in this case.
Based on his analysis of what he used as comparable sales and his adjustments. Mr. Nadeau arrived at a value of $50 per square foot for the subject property. This was at the high end of the range of his comparable sales which ran from $19.73 to $53.57.
Mr. Flanagan in his analysis of land values developed three separate categories of sales which he selected for the reasons given. Each had some rational which justified looking at them. The range of price per square foot varied from a low of about $2.21 to a high in the area of $86. depending upon the uses and improvements. In addition, Mr. Flanagan in his report looked at other alternatives including sales of improved properties in various categories which he found, when adjusted, to support his opinion. Each appraiser offered his opinion of appropriate adjustments to the various sales and differing perspectives on the. significance of improvements and locations. The appraisers had different views as to the possible use of sales to Pfizer in connection with its development nearby. Some of the properties considered were nearby, others were some distance or in other towns. Counsel in cross-examination called the city's witness' attention to sales used in other court cases but omitted from their report. The court has considered all the sales offered, the adjustments needed because of the proximity to Pfizer, Fort Trumbull, the sewer treatment plant, the water view and the proximity to CT Page 14542 waterfront property nearby, as well as those mentioned by the experts who testified on both sides of the case. The court, giving consideration to these sales, and applying the equitable and legal rules outlined above, and giving consideration to the fact that a portion of a business was conducted on the property, finds that the land component of the subject property had a fair market value at the time of taking of $16.00 per square foot. Multiplied by to 9, 100 square foot size of the subject property this brings the court's finding of the value of the land to be $145,600.
There remains the issue relating to the so-called "trade fixtures". The parties views and legal claims are outlined above. The citations of the defendant to the law of other states and the views of legal scholars is not persuasive in this area since our Connecticut courts have spoken so clearly and so often on the subject of fixtures and the process of establishing awards in condemnation cases. Nor does it assist the defendant's argument to assign a special name to the theory advanced.
The court is more persuaded by the arguments and traditional legal analysis advanced by the city as outlined above and finds that to the extent any of the various items inventoried by Mr. Rusciano on behalf of the defendant were actually fixtures as defined by our Connecticut courts (such as doors, windows, cement floors, masonry loading docks, insulation, sheetrock, metal stud framing, wiring, stairways, beams, floor tile and wall paneling), they were an integral part of the building and included in the fair market value given for the same. The remaining items (such as motor vehicles, forklifts, clock, fire extinguisher, cannon copier, desk, chairs, office and advertising supplies) are not fixtures and thereby part of the real estate and have not been acquired or condemned by the city in this proceeding. For that reason no separate value will be assigned to any of those items.
As a separate and distinct rational, the court finds that no evidence of the "fair market value" of such items was provided by the defendant and for that reason, even if the court were to otherwise find the items compensable, no separate value for these items can be found by the court from the evidence.
The values found by the court take into consideration that a part of a business was conducted on the premises condemned, but does not consider as a separate element of damages the injury to or even the destruction of that business.
Accordingly, after weighing the evidence, the equities involved and considering the credibility of the witnesses, the court makes an CT Page 14543 independent determination of the value of the subject property and fair compensation in the light of all the circumstances, its general knowledge and the viewing of the subject property to be FOUR HUNDRED EIGHT THOUSAND SIX HUNDRED ($408,600.00) DOLLARS.
___________________ Robert C. Leuba, JTR CT Page 14544