[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The above captioned case involved the taking of 0.52 of an acre of undeveloped land owned by Alice C. Jarvis fronting on Route 83, also known as Talcottville Road in the town of Vernon, under the commissioner's statutory powers, including § 13a-73 (f) of the General Statutes whose stated purpose is the protection of the "safety of the traveling public to and from any state highway or state highway appurtenances when in his judgment such limitation of access is necessary to permit the convenient, safe and expeditious flow of traffic." The defendant in this appeal seeks the reassessment of damages for the taking and asserts that the commissioner's assessment of damages as $165,200 is inadequate.
This memorandum of decision is being filed simultaneously with the court's opinion in a companion case, Commissioner of Transportation v.Jarvis Realty Company, Superior Court, judicial district of Tolland at Rockville, Docket No. 98-0067360, because the cases were tried together and the respective takings involved the same project, namely, the town's decision to relocate a town road, Wilshire Road, because of the safety concerns of town officials about the preexisting multiple access points to and from the state highway and the potential for conflicting traffic movements on the part of motorists. These traffic concerns were generated by the fact that before the takings, vehicular access to, and egress from, a bowling facility just north of the Alice Jarvis property, known as "Vernon Lanes" that was built in 1963 and operated by Jarvis Realty Company continuously since that time, were available to its patrons by means of three separate curb cuts into the highway, but only two such driveways remained as a result of the project. which included the relocation of the former intersection of Route 83 with Wilshire Road a short distance south of the former intersection which was signalized for bowling alley patrons as well as for vehicles traveling on the relocated town road.
The state's evidence in the Alice Jarvis case included the testimony of CT Page 16026 Richard Armstrong. the project coordinator for the relocation of Wilshire Road in relation to Route 83. who testified that the town initiated the project in 1994 and that he worked with the town planner and the town's consulting engineers, and "it was their concept to do what has been done." He also stated that the state was responsible for the review of the scope and design of the work as it progressed to ensure that it met the traffic safety concerns of the town as well as those of those of the department of transportation.
Another state traffic engineer who was involved in the project. Vincent Avino, testified in the Jarvis Realty Company phase of the hearing that it was the department's policy to combine driveways that enter and exit state highways that carry high volumes of traffic, such as Route 83 at its intersection with Hockanum Boulevard from the west. He also said that the relocation of Wilshire Road to that newly signalized intersection eliminated what would have otherwise been two unnecessarily closely spaced traffic lights, and that it was his opinion that the project improved the safety of motorists traveling on Route 83 as well as the town's concerns about the safety of patrons entering or leaving the bowling alley.
In the course of Armstrong's testimony relating to the Alice Jarvis taking, he was asked whether he knew of any zoning issues, particularly as to variances, pertaining to the subject property and his reply was that he knew of only one, namely, the statutorily mandated variance under the provisions of § 48-24 of the General Statutes which requires that where there is a taking of only a part of an owner's land, and if "the remaining portion of such property does not conform to the area requirements of existing zoning regulations [a condemning authority shall] obtain a zoning variance for such remaining portion of property from the local zoning board of appeals before condemning any portion of such property." He then identified plaintiffs Exhibit I, dated August 26, 1997, as a variance granted by the zoning board of appeals of the town of Vernon to the department of transportation pursuant to the statute, that reduced the required lot area of the subject property from 3 acres to 2.56 acres for the purpose of relocating Wilshire Road before the partial condemnation of the Alice Jarvis property. notice of which was given by the condemning authority on July 17, 1998.
The defendant called Gene Bolles, the chief building official and zoning enforcement officer for the town of Vernon, to testify as to the open space requirements of the planned commercial zone as they apply to the Alice Jarvis property. He stated that § 4.21.2 of the regulations for the planned commercial zone that impose open space requirements, which have remained unchanged since the taking in 1998, require a minimum CT Page 16027 lot area of 3 acres and a minimum lot width of 180 feet.
Prior to the taking the lot width of her frontage on Route 83 was 242.3 feet, but after the taking the width was reduced to 69 feet, and Bolles testified that he could not issue a building permit or a zoning permit for the remaining portion of the property because General Statutes §8-3 (f) prohibits him from doing so where such permits are sought for nonconforming buildings, uses or structures, and a site plan showing any such nonconformity would have to be rejected. When he was shown a topographic map of the remaining land he described the elevation and slope of the land as rising "dramatically", and also mentioned the fact that under the town's general zoning regulations, acreage with slopes greater than 15% was not considered to be developable.
When Bolles was asked upon cross-examination to predict the chances for the granting of a variance where, as in this case, the town itself had initiated the project, he declined to do so, but also noted that the requested variances had been granted or denied on a case by case basis depending on whether or not the applicant had satisfied the board that a bona fide hardship existed. He also stated that "based on past history, what the Board looks at very carefully is whether or not it's a self-created condition [but in this case it] was not self-created by the property owner [and there's] no question about that [and if] you convince them that this would be in the best interests of the development of the [town], that it's for the public good [then this] appears to be a good application."
The defendant's appraiser was Peter Marsele, whose inspection of the premises was made on December 23, 1999, and formed the basis for two different appraisals by him of the same property dated, respectively, April 3, 2000 and May 2, 2001, the first of which estimated the damages for the taking at $414,000, and the second of which reassessed damages at $695,000. In his responses to questions put to him by the court about the reasons for the discrepancies in the two reports between his original conclusion concerning the highest and best use of the remaining portion of the Alice Jarvis property, he acknowledged that his opinion in that respect "was erroneous, and not only erroneous, but it was partially omitting things that should have been in there [and that's] why I changed the whole method [and] context of the second report versus the first report."
The first report states that the highest and best use "to which this property can be put is a continuation of its present use for offstreet parking in connection with the parking area next north of [the] subject." The second report indicates that "[t]he best use to which the subject CT Page 16028 property can be put is for development with a commercial business which conforms with zoning and is compatible with properties along Route #83 [and notes later in the report that the] best use to which the remaining land can be put is for sale to an abutting owner or owners [and that a] portion of the land could be sold to the owner of the `Vernon Lanes', and [although] portions of the land could be sold to owners of dwellings on Wilshire [Road] whose rear lots back up to the remaining land [he] [could not] assume the abutting owners would have any interest in acquiring the portions of subject remaining land."
Marsele's appraisal testimony was based entirely on his report of May 2, 2001, which estimated the value of the defendant's land after the taking to be $66,000, its value before the taking as $761,000, and that her resulting damages were $695,000 using the sales comparison approach. He stated that he had contacted the manager of Vernon Lanes only for the purpose of determining whether the parking lot was ever filled to capacity, and upon learning that it was never filled, assumed that because Jarvis Realty was in compliance with the zoning regulation that requires at least three parking spaces for each of its thirty-two bowling alleys, it would have had no interest in buying the front portion of the Alice Jarvis property.
He stated, however, that his valuation of $66,000, or fifty cents per square foot, would be substantially greater if Jarvis Realty were to be a potential buyer, and if it had a need for the land, it was Marsele's opinion that it could be sold for $5.25 per square foot, which was his valuation of the land before the taking. He did not, however, believe that any other party would bid on the nonconforming property, "[a]nd the only reason Vernon Lanes could put it to any use is because they owned the abutting land in which they could enlarge [it] because they're the only ones that could put it to any use."
In the course of his examination by counsel and the court, Marsele testified that the reason he had given such a low after-taking value for the remaining land was that he could not "guarantee that the Vernon Lanes would be interested [in buying it] even though that is the highest and best use [and] I feel that I can't pre-assume an abutter buying a property until there's shown interest [and the] only interest they've had in the past, is the fact that they have apparently been able to use it without any easements or rights." Upon cross-examination he acknowledged that he had not talked to any agent or principal of Jarvis Realty Company, other than counsel for the corporation, and that he never investigated what its present or future plans, if any, were to expand or develop the front parcel, and no information was disclosed to him, at least while the realignment project was in progress, indicating whether CT Page 16029 or not the corporate owner of the bowling alleys had any interest, either in part of the remaining Alice Jarvis land, and/or in another undeveloped parcel of about nine acres of undeveloped land that she owned which also abutted the Vernon Lanes to the north.
Marsele utilized the same three property sales at various locations zoned for business in the town of Manchester, and in both of his reports he made the identical adjustments on his land adjustment charts despite the fact that in the second report his opinion was that the highest and best use "to which the subject property can be put is for development with a commercial business which conforms with zoning and is compatiblewith properties along Route #83." (Emphasis added.) In response to a question as to why he did not use different comparable sales in view of the fact that he had changed, or at least modified his opinion about the highest and best use for the property, he stated that there were no other comparable sales available "because of the lack of market activity in the commercial zone properties, which is another reason why I went into Manchester to try to get sales as closely related in time to the subject property [since there] was not a great deal of market value to draw upon."
Marsele was also questioned about the provisions of § 4.21.1 of the town's zoning regulations pertaining to its planned commercial zone in 1998, which was specifically designated in accordance with the master plan specifically to regulate commercial and office space development along Route 83 (Talcottville Road) from its intersection with Wilshire Road to the area adjacent to Dart Hill Road, a distance of about seven tenths of a mile north of the subject property, in order to encourage the development of commercial and office space uses which have the least potential for generating additional traffic to Route 83, to insure safe ingress and egress patterns for new developments, and to encourage the development of medium or large scale commercial buildings. He stated that a regulation that applied to a specific portion of a roadway was very unusual and unique and although he had many years of experience in many towns in the state of working with zoning regulations, he did not think he had ever seen such a highly particularized description for such a zone.
He acknowledged that a comparable sale of land that was in proximity to the subject property on Talcottville Road would be desirable, but that he felt that any sale four years before the taking was "pretty far removed from the taking date." He also stated that "even though the market was, in general, flat because of the lack of commercial sales in the matter of time to the subject taking, I felt time was of importance." CT Page 16030
Marsele concluded his testimony by stating that he was aware of, but did not use an assemblage sale that the state's appraiser, Michael Aletta had used in his valuation, because he "didn't think it was as pertinent" as the Manchester sales that he used in his appraisal. He agreed, however, that the highest and best use was the preexisting use "because if you didn't use the assemblage on that sale property, you wouldn't have a conforming property."
James Sauve, one of the three appraisers who testified in this case, was originally retained by the state to determine the damages for the partial taking contemplated by the plaintiff of the Alice Jarvis parcel located on the southerly side of the bowling alley complex. His appraisal report dated January 14, 1997, stated that its purpose was to assist the state of Connecticut in its decision to acquire property rights for the Route 83 and Wilshire Road realignment, and assessed the defendant's damages at $185,000.
The state, however, subsequently chose to rely on the later appraisal made by Aletta on May 29, 1997, in which he stated that her damages were $165,000, based on a before value of $2.25 per square foot and an after value of $1.30 per square foot. It is significant that both Aletta, an appraiser employed by the department of transportation, and Sauve, a self-employed independent appraiser, were both of the opinion that the value of the defendant's property before the taking was $2.25 per square foot and that there was only a fifteen cent difference in Sauve's after value of $1.15, despite the fact that some of the comparable sales that they used were different.
Sauve's report notes that the taking area consisted of 22, 738 square feet of land at the southwesterly portion of the property that reduced its size from 3.26 acres to 2.74 acres and its road frontage from 242.3 feet to 69 feet. He also states that "[t]he taking renders the subject property non-conforming to current zoning regulations [and as] such, the ability to develop the site is greatly reduced and the highest and best use of the property is for sale to an abutter for assemblage."
Before the taking, he concluded that its highest and best use was for commercial development and that the frontage on Route 83 contained about an acre that appeared to be suitable for that purpose, but that the rear portion of about two acres that formed a long narrow rectangle was not practicable for development because of its reduced width and its steep topography. He also noted that fifty or sixty feet of the northerly boundary of the property was being used by the abutting bowling facility and was "paved for parking, and nearer the building there was like a roadway, or driveway, that allows traffic around back of the building." CT Page 16031
His opinion was that the state took "what I considered to be the most developable part of the site the flat, or the more favorable, the wider flatter piece located towards Route 83 [and that therefore] I reduced the per square foot value from $2.25 to $1.15 per square foot for what was left." He also reasoned that because the northerly side had been used primarily for parking for patrons of the "Vernon Lanes" as well as a driveway around the back of the building, he assumed that "it had value to the abutter [and so] I concluded in the After analysis that the highest and best use of the property was for assemblage to abutting parcels."
He also pointed out that in his comparative analysis with other commercially zoned properties he considered the intent and purposes of Vernon's planned commercial zone which were designed to discourage high traffic uses, such as fast food restaurants, because "typically the buyers [for such uses] pay the highest premium for sites for exposure to a high volume of traffic." Therefore, because of the unusual and unique nature of the town's planned commercial zone, and the fact that its zoning regulations "clearly discouraged a high traffic generator, that [factor] had to be considered in the sales that are chosen for comparison to the subject property."
Sauve testified that in reaching his conclusion that the best use of the remaining parcel would be assemblage or merger of the abutting properties, the abutter that he had in mind was Jarvis Realty "because they were already using most of the area [and it] is the logical abutter for the lower portion." He also stated that another element enhancing the value to the owner of the bowling alley was the fact that the northerly property line was virtually at the southerly wall of its building and that it would give the owner access around the building if it needed it for any reason, including the possible expansion of the present building.
In his testimony he also addressed the question of the utilization of sales that would otherwise be comparable, except for the lapse of time between the sale and the appraisal, by saying that where sales of commercial property are flat or stagnant, exclusion or adjustment for such sales may not be necessary and can be just as helpful as more recent sales. He stated that "there was a period of time through the early 90's, right up until the time I did this report, where there was very little activity along the lines of commercial land sales." Two of his three comparable sales were on Talcottville Road very close to the subject property, and he made a time adjustment on one sale in 1994, but none on the sale of the other in October, 1996, because it was only three months before his appraisal. CT Page 16032
In response to questions put to him by the court, Sauve stated that under the facts of this case, the Alice Jarvis property after the taking was worth more to Jarvis Realty than any other abutter or any other third party, and that it would be ready, willing and able to buy it at the value he ascribed to it after the taking, "[b]ecause it would enhance the value of their property by at least as much as the amount they would pay." Marsele apparently shared the same belief because he testified that the assemblage of both properties would eliminate the nonconformity that any other potential buyer would have to consider, and went even further by stating that "[i]f Jarvis Realty had an interest and/or a need [for the property], it would be my opinion they'd [pay] the five dollars and twenty-five cents a square foot that I put in the before value."
At one point in the course of Sauve's testimony when he confirmed the fact that his damage estimate had been $185,000, plaintiffs counsel stated that his valuation was not accepted by the state because "[w]e did not accept that number [and we] had another appraisal done." When the court asked whether a second appraisal was commonly requested by the condemning authority, Aletta, who had made the subsequent damages valuation for the state, explained that "[t]ypically on complex appraisals, we have the option of using two [and since] this was a complex appraisal, the Department chose to have a second appraisal done."
Aletta testified that he had filed his first appraisal on May 29, 1997, and his second on the date of the taking, July 17, 1998, but the damages estimate of $165,200 that he arrived at were the same in each report. The two components which are the subject of his appraisal are designated as parcels B and A, parcel B being the Alice Jarvis parcel on the southerly side of the Jarvis Realty land and building, and parcel A consisting of a nine acre parcel of undeveloped land also owned by Alice Jarvis north of the Jarvis Realty upon which the state proposed to install a curb cut on the northwesterly side of the property fronting on Route 83 that would permit only right turns into the northbound lane of the highway in order to reduce the traffic hazards involving left turns. See Commissioner of Transportation v. Jarvis Realty Company, supra, pp. 5-6. As to parcel A, Aletta's opinion was that the defendant, Alice Jarvis, "was entitled to only a nominal payment of two hundred dollars because [she] had sustained no damages as a result." Id.
With respect to parcel B, Aletta "noted that there is a paucity of comparables [and the] sales used in this report are the best comparables available." The report also states that all sales were adjusted for size because smaller parcels tend to sell at higher unit prices and any such size adjustments took into consideration the subject property's narrow CT Page 16033 and irregular shape and sloping topography.
All of his comparables were located on route 83 in close proximity to the subject property and one of the comparable sales used by both Sauve and Aletta was only one-half a mile north of of the subject property and was also located in the planned commercial zone. However, the one issue upon which he appeared to differ with his fellow appraisers was the following statement in his report: "For appraisal purposes, the subject is deemed to have received variances for any non-conformance items."
Aletta was cross-examined at length by counsel for the defendant about exactly what he meant by that sentence in his report, and his answer essentially was that he had customarily used that phraseology in "[a]ny report where this type of situation exists where there are variances that are highly likely [will be] assumed [to be] granted." He also stated that the phrase "deemed to be granted" was meant to apply prospectively based on his conversations with town officials, and that the town planner had indicated to him what his view was as to whether or not the required variances might be granted in this particular case, but further questioning along those lines was properly objected to by counsel and sustained by the court as speculative.
The foregoing summary of the expert testimony in this case indicates that the only appraiser who assumed that because the realignment project as well as the taking was initiated and promoted by the town, any necessary variances would be granted by the zoning board of appeals, notwithstanding the fact that Bolles, whose duties as chief building official and zoning enforcement officer since 1983 required him to attend all the meetings of that board, declined to predict the chances for a result favoring an applicant because variances had been granted or denied on a case by case basis. On the other hand, Sauve stated unequivocally that the taking had made the subject property nonconforming under current zoning regulations thereby reducing the developability of the remainder of the Alice Jarvis land that abutted the bowling alley and therefore its highest and best use after the taking was for sale to Jarvis Realty for assemblage or merger. Marsele's opinion was substantially the same in that assemblage would eliminate the zoning nonconformity.
In determining just compensation for condemned land, generally the highest and best use for such property may be found to be a use in conjunction with another parcel, so long as there is a reasonable possibility that the parcels will be so combined, and any increment of value resulting from such combination may be taken into consideration in valuing the parcel taken. 26 Am.Jur.2d, Eminent Domain § 323 (1996). "The doctrine of assemblage applies when the highest and best use of CT Page 16034 separate parcels involves their integrated use with lands of another [and pursuant] to this doctrine, such prospective use may be properly considered in fixing the value of the property if the joinder of the parcels is reasonably practicable." 4 P. Nichols, Eminent Domain (3d Ed. Rev. 2000, J. Sackman B. Van Brunt eds.) § 13.02[9], p. 13-35.
Our Supreme Court first addressed the assemblage doctrine as it applies in condemnation proceedings and held that "an award may be made based on a parcel's highest and best use when that use requires an assemblage of separate lands." Commissioner of Transportation v. Towpath Associates,255 Conn. 529, 548 (2001). A footnote in that decision discussed the division of opinion in state courts as to whether or not the doctrine should apply "[w]ithout at least substantial unity of ownership and some indication of unity of use [but because] the trial court's decision in this case did not address this issue, we need not decide whether a unity of ownership is an essential predicate to an application of the doctrine of assemblage." Id., 549 n. 13.
The footnote just cited also refers to a Wisconsin case that holds that unity of ownership of all the parcels condemned should not be required for the application of assemblage "because it permits property owners to establish a legitimate element of the fair market value of the property, i.e., its value in conjunction with adjacent land to which the owners may or may not hold title." Clarmar Realty Co., Inc. v. RedevelopmentAuthority, 383 N.W.2d 890, 895 (Wis. 1986). Our Appellate Court has recently cited that case with approval when it held that unity of title is not a necessary prerequisite to the application of the assemblage doctrine and that if "the combination of parcels is reasonably probable and the prospective, integrated use is not speculative or remote, assemblage analysis is a proper valuation approach." Franc v. BethelHolding Co., 73 Conn. 114, 120-26 (2002).
The court concurs with the appraisers' opinions that the highest and best use of the remaining portion of the defendant's land after the taking would be for assemblage, and at least Marsele and Sauve were in agreement that Jarvis Realty would be the only potential buyer who would be ready, willing and able to purchase what would otherwise be a nonconforming parcel. Although Aletta felt that there would be buyers who might be interested, other than her abutter to the north of the property, his assumption that variances would be easily obtainable was refuted by Bolles' testimony as well as our case law which does not treat a possibility as a reasonable probability where it is based on "[w]ishful thinking, optimistic conjecture, speculation, rumor and unfounded prognostications [which] do not furnish a proper basis for a finding that a litigant has proved the reasonable probability of [a variance or] of CT Page 16035 future change in zone." Budney v. Ives, 156 Conn. 83, 89-90 (1968).
The court has some serious doubts as to the weight that should be given to Marsele's report and court testimony apart from the fact that by his own admission he characterized his first report as being erroneous, that it contained omissions and that he had to change his entire method of valuation and the substance of his second report. Assuming that the errors and omissions in the prior report were inadvertent, including his former opinion that the highest and best use would be a continuation of its current use for parking by the bowling alley patrons, his second report stated that the best use would be for a commercial business which conforms to zoning and is compatible with properties along Route #83. (Emphasis added.)
The two other appraisers tried to utilize sales of commercial properties along the highway in the Vernon area in close proximity to the subject property, and both of them used an assemblage sale located in the planned commercial zone about a half mile north of Wilshire Road. On the other hand, Marsele used Manchester properties exclusively, none of which were along Route #83, despite the fact that he described the regulation governing that zone as unique in his experience because of its restrictions on businesses generating high volumes of traffic.
The court also accepts the testimony of Sauve concerning the limited number of commercial sales at or about the time that he made his appraisal as well as his opinion that when sales of commercial properties are "flat", the exclusion or adjustment for such sales may not be necessary and can be just as helpful as more recent sales. The reliability of the comparative sales used by Sauve and Aletta, although some sales were different, is bolstered by the fact that after each of them made his independent adjustments, their value before the taking was identical at $2.25 per square foot and their respective after values were $1.15 per square foot by Sauve and $1.30 per square foot by Aletta.
While the state's rejection of Sauve's original assessment of damages as $185,000 are unclear and are susceptible to various inferences, the rationale for his opinion as expressed in both his report and in his testimony are persuasive. He based his value, among other things, on the fact that the developability of the site had been greatly reduced by the taking, but because its northerly side had been used since 1963 for patrons of the bowling alleys, and a driveway gave access to the back of the building he assumed it had value to Jarvis Realty, and he concluded in his after taking analysis that the highest and best use of the property was for assemblage. CT Page 16036
He also explained that in his comparative analysis with other commercially zoned properties he considered the intent and purposes of the planned commercial zone to be to discourage high traffic uses, such as fast food restaurants, because the typical buyer for such uses pay very high prices to acquire sites that generate a high volume of traffic. In doing his comparative analysis he kept in mind the fact that Vernon's unique and unusual zoning regulations had to be considered in the sales that were chosen for comparison to the subject property.
After giving due consideration to the opinions of the experts in this case, and having made an independent determination of fair compensation in the light of all the evidence, and after viewing the site of the subject property, the court finds that the before taking value of the property was $320,000, and that the after taking value was $135,000, resulting in damages of $185,000.
It is ordered that judgment enter for the defendant, Alice Jarvis, to recover of the plaintiff $185,000, a sum $19,800 greater than the $165,200 assessed by the commissioner as damages for the taking. Interest at a rate that is reasonable and just pursuant to General Statutes §37-3c is also awarded on the excess of $19,800 from July 17, 1998 to the date of payment. If the parties are unable to agree upon the amount of interest, the court will hold an additional hearing for that purpose.
___________________ Harry Hammer Judge Trial Referee CT Page 16037